CASTANEDA, SHERIFF *v.* PARTIDA

No. 75–1552. Argued November 9, 1976—Decided March 23, 1977

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined. MARSHALL, J., filed a concurring opinion, *post*, p. 501. BURGER, C. J., filed a dissenting opinion, in which POWELL and REHNQUIST, JJ., joined, *post*, p. 504. STEWART, J., filed a dissenting opinion, *post*, p. 507. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 507.

*Thomas Parker Beery* argued the cause and filed a brief for petitioner.

*David G. Hall* argued the cause for respondent. With him on the brief was *Melvin L. Wulf*.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

The sole issue presented in this case is whether the State of Texas, in the person of petitioner, the Sheriff of Hidalgo County, successfully rebutted respondent prisoner's prima facie showing of discrimination against Mexican-Americans

in the state grand jury selection process. In his brief, petitioner, in claiming effective rebuttal, asserts:

> "This list [of the grand jurors that indicted respondent] indicates that 50 percent of the names appearing thereon were Spanish. The record indicates that 3 of the 5 jury commissioners, 5 of the grand jurors who returned the indictment, 7 of the petit jurors, the judge presiding at the trial, and the Sheriff who served notice on the grand jurors to appear had Spanish surnames." Brief for Petitioner 6.

## I

This Court on prior occasions has considered the workings of the Texas system of grand jury selection. See *Hernandez v. Texas,* 347 U.S. 475 (1954); *Cassell v. Texas,* 339 U. S. 282 (1950); *Akins v. Texas,* 325 U. S. 398 (1945); *Hill v. Texas,* 316 U. S. 400 (1942); *Smith v. Texas,* 311 U. S. 128 (1940). Texas employs the "key man" system, which relies on jury commissioners to select prospective grand jurors from the community at large.[1] The procedure begins with the state district judge's appointment of from three to five persons to serve as jury commissioners. Tex. Code Crim. Proc., Art. 19.01 (1966).[2] The commissioners then "shall select not less than 15 nor more than 20 persons from the citizens of different portions of the county" to compose the list from which the actual grand jury will be drawn. Art. 19.06 (Supp. 1976–1977).[3] When at least 12 of the persons on the list appear in

---

[1] The other principal state mode of juror selection is a random method similar to that used in the federal system. See 28 U. S. C. § 1864. See generally Sperlich & Jaspovice, Grand Juries, Grand Jurors and the Constitution, 1 Hastings Const. L. Q. 63, 68 (1974).

[2] During the time period covered by this case, the statute was amended to omit the requirement that the commissioners be freeholders in the county. 1971 Tex. Gen. Laws, c. 131, § 1. That change has no bearing on the issues before us.

[3] Prior to 1965, the law directed the commissioners to select "sixteen

court pursuant to summons, the district judge proceeds to "test their qualifications." Art. 19.21. The qualifications themselves are set out in Art. 19.08: A grand juror must be a citizen of Texas and of the county, be a qualified voter in the county, be "of sound mind and good moral character," be literate, have no prior felony conviction, and be under no pending indictment "or other legal accusation for theft or of any felony." Interrogation under oath is the method specified for testing the prospective juror's qualifications. Art. 19.22. The precise questions to be asked are set out in Art. 19.23, which, for the most part, tracks the language of Art. 19.08. After the court finds 12 jurors who meet the statutory qualifications, they are impaneled as the grand jury. Art. 19.26.

## II

Respondent, Rodrigo Partida, was indicted in March 1972 by the grand jury of the 92d District Court of Hidalgo County for the crime of burglary of a private residence at night with intent to rape. Hidalgo is one of the border counties of southern Texas. After a trial before a petit jury, respondent was convicted and sentenced to eight years in the custody of the Texas Department of Corrections. He first raised his claim of discrimination in the grand jury selection process on a motion for new trial in the State District Court.[4] In sup-

---

men." The legislature amended the statute that year to substitute the words "twenty persons" for "sixteen men." 1965 Tex. Gen. Laws, c. 722, p. 317. In 1967, the law was amended again to provide the present range of from 15 to 20 persons. 1967 Tex. Gen. Laws, c. 515, § 1. These changes in the number of persons required to be on the list account for the jump from 16 to 20 in the grand jury list statistics set forth in n. 7, *infra*.

[4] In the state courts and in the federal courts on habeas, the State argued that respondent's challenge was not timely raised as a matter of state procedure, and therefore that he waived any complaint of this kind that he might have. Since the Texas courts considered the claim on its merits, however, we are free to do so here. See *Coleman* v. *Alabama*, 377 U. S. 129 (1964); cf. *Francis* v. *Henderson*, 425 U. S. 536, 542 n. 5

port of his motion, respondent testified about the general existence of discrimination against Mexican-Americans in that area of Texas and introduced statistics from the 1970 census and the Hidalgo County grand jury records. The census figures show that in 1970, the population of Hidalgo County was 181,535. United States Bureau of the Census, 1970 Census of Population, Characteristics of the Population, vol. 1, pt. 45, § 1, Table 119, p. 914. Persons of Spanish language or Spanish surname totaled 143,611. *Ibid.*, and *id.*, Table 129, p. 1092.[5] On the assumption that all the persons of Spanish language or Spanish surname were Mexican-Americans, these figures show that 79.1% of the county's population was Mexican-American.[6]

---

(1976). Furthermore, petitioner abandoned the waiver point in his petition for certiorari.

[5] For our purposes, the terms "Spanish-surnamed" and "Mexican-American" are used as synonyms for the census designation "Persons of Spanish Language or Spanish Surname." Persons of Spanish language include both those whose mother tongue is Spanish and all other persons in families in which the head of the household or spouse reported Spanish as the mother tongue. Persons of Spanish surname, as the census uses that term, are determined by reference to a list of 8,000 Spanish surnames compiled by the Immigration and Naturalization Service. For Texas, social and economic characteristics are presented for persons of Spanish language combined with all other persons of Spanish surname in the census reports. United States Bureau of the Census, 1970 Census of Population, Characteristics of the Population, vol. 1, pt. 45, § 2, App. B.

[6] At oral argument, counsel for petitioner appears to have suggested that the presence of illegal aliens who have Spanish surnames might inflate the percentage of Mexican-Americans in the county's population. Tr. of Oral Arg. 10–12. We cannot agree that the presence of noncitizens makes any practical difference. Table 119 of the census breaks down the 181,535 people who composed the total county population into three groups: native of native parentage, native of foreign parentage, and foreign born. The only persons as to whom the assumption of noncitizenship would be logically sustainable are the foreign born. Even for them, it is probable that some were naturalized citizens. Furthermore, only 22,845 persons were in the "foreign born" category. If those persons are excluded from

Respondent's data compiled from the Hidalgo County grand jury records from 1962 to 1972 showed that over that period, the average percentage of Spanish-surnamed grand jurors was 39%.[7] In the 2½-year period during which the District Judge who impaneled the jury that indicted respondent was in charge, the average percentage was 45.5%. On the list from which the grand jury that indicted respondent was selected, 50% were Spanish surnamed. The last set of data that respondent introduced, again from the 1970 census, illustrated a number of ways in which Mexican-Americans tend to be underprivileged, including poverty-level incomes, less desirable jobs, substandard housing, and lower levels of

---

the population of the county, the total becomes 158,690. Assuming that every foreign-born person was counted as a Spanish-surnamed person (an assumption that favors the State), the total number of Mexican-Americans is reduced from 143,611 to 120,766. Using these adjusted figures, Mexican-Americans constitute 76.1% of the county's population, a figure only 3%, and thus negligibly, smaller than the one used throughout this litigation. For consistency, we shall continue to refer to the population figures for the entire county, particularly since the State has not shown why those figures are unreliable.

[7] The statistics for grand jury composition can be organized as follows:

| Year | No. persons on grand jury list | Av. No. Spanish surnamed per list | Percentage Spanish surnamed |
|------|------|------|------|
| 1962 | 16 | 6 | 37.5% |
| 1963 | 16 | 5.75 | 35.9% |
| 1964 | 16 | 4.75 | 29.7% |
| 1965 | 16.2 | 5 | 30.9% |
| 1966 | 20 | 7.5 | 37.5% |
| 1967 | 20.25 | 7.25 | 35.8% |
| 1968 | 20 | 6.6 | 33% |
| 1969 | 20 | 10 | 50% |
| 1970 | 20 | 8 | 40% |
| 1971 | 20 | 9.4 | 47% |
| 1972 | 20 | 10.5 | 52.5% |

Of the 870 persons who were summoned to serve as grand jurors over the 11-year period, 339, or 39%, were Spanish surnamed. See table showing Hidalgo County grand jury panels from 1962 to 1972, App. 17–18.

education.[8] The State offered no evidence at all either attacking respondent's allegations of discrimination or demonstrating that his statistics were unreliable in any way.

[8] At oral argument, counsel for petitioner suggested that the data regarding educational background explained the discrepancy between the percentage of Mexican-Americans in the total population and the percentage on the grand jury lists. Tr. of Oral Arg. 8. For a variety of reasons, we cannot accept that suggestion. First, under the Texas method of selecting grand jurors, qualifications are not tested until the persons on the list appear in the District Court. Prior to that time, assuming an unbiased selection procedure, persons of all educational characteristics should appear on the list. If the jury commissioners actually exercised some means of winnowing those who lacked the ability to read and write, it was incumbent on the State to call the commissioners and to have them explain how this was done. In the absence of any evidence in the record to this effect, we shall not assume that the only people excluded from grand jury service were the illiterate.

Second, it is difficult to draw valid inferences from the raw census data, since the data are incomplete in some places and the definition of "literacy" would undoubtedly be the subject of some dispute in any event. The State's failure to discuss the literacy problem at any point prior to oral argument compounds the difficulties. One gap in the data occurs with respect to the younger persons in the jury pool. The census reports for educational background cover only those who are 25 years of age and above. Yet the only age limitation on eligibility for grand jury service is qualification to vote. Tex. Code Crim. Proc., Art. 19.08 (Supp. 1976–1977). During the period to which the census figures apply, a person became qualified to vote at age 21. Tex. Elec. Code, Art. 5.01 (1967). (In 1975, Art. 5.01 was amended to give the franchise to all persons 18 and over. 1975 Tex. Gen. Laws, c. 682, § 3.) It is not improbable that the educational characteristics of persons in the younger age group would prove to be favorable to Mexican-Americans.

Finally, even assuming that the statistics for persons age 25 and over are sufficiently representative to be useful, a significant discrepancy still exists between the number of Spanish-surnamed people and the level of representation on grand jury lists. Table 83 of the 1970 census shows that of a total of 80,049 persons in that age group, 13,205 have no schooling. (Data for McAllen-Pharr-Edinburg Standard Metropolitan Statistical Area. This SMSA is identical to Hidalgo County.) Table 97 shows that of the 55,949 Spanish-surnamed persons in the group, 12,817 have no schooling. This means that of the 24,100 persons of all other races and ethnic groups,

The State District Court, nevertheless, denied the motion for a new trial.

On appeal, the Texas Court of Criminal Appeals affirmed the conviction. *Partida* v. *State,* 506 S. W. 2d 209 (1974). Reaching the merits of the claim of grand jury discrimination, the court held that respondent had failed to make out a prima facie case. In the court's view, he should have shown how many of the females who served on the grand juries were Mexican-Americans married to men with Anglo-American surnames, how many Mexican-Americans were excused for reasons of age or health, or other legal reasons, and how many

388 have no schooling. Translated into percentages, 22.9% of the Spanish-surnamed persons have no schooling, and 1.6% of the others have no schooling. This means that 43,132 of the Spanish-surnamed persons have some schooling and 23,712 of the others have some schooling. The Spanish-surnamed persons thus represent 65% of the 66,844 with some schooling, and the others 35%. The 65% figure still creates a significant disparity when compared to the 39% representation on grand juries shown over the 11-year period involved here.

The suggestion is made in the dissenting opinion of THE CHIEF JUSTICE, *post,* at 504–506, that reliance on eligible population figures and allowance for literacy would defeat respondent's prima facie showing of discrimination. But the 65% to 39% disparity between Mexican-Americans *over* the age of 25 who have some schooling and Mexican-Americans represented on the grand jury venires takes both of THE CHIEF JUSTICE's concerns into account. Statistical analysis, which is described in more detail in n. 17, *infra,* indicates that the discrepancy is significant. If one assumes that Mexican-Americans constitute only 65% of the jury pool, then a detailed calculation reveals that the likelihood that so substantial a discrepancy would occur by chance is less than 1 in $10^{50}$.

We prefer not to rely on the 65% to 39% disparity, however, since there are so many implicit assumptions in this analysis, and we consider it inappropriate for us, as an appellate tribunal, to undertake this kind of inquiry without a record below in which those assumptions were tested. We rest, instead, on the fact that the record does not show any way by which the educational characteristics are taken into account in the compilation of the grand jury lists, since the procedure established by the State provides that literacy is tested only after the group of 20 are summoned.

of those listed by the census would not have met the statutory qualifications of citizenship, literacy, sound mind, moral character, and lack of criminal record or accusation. *Id.*, at 210–211. Quite beyond the uncertainties in the statistics, the court found it impossible to believe that discrimination could have been directed against a Mexican-American, in light of the many elective positions held by Mexican-Americans in the county and the substantial representation of Mexican-Americans on recent grand juries.[9] *Id.*, at 211. In essence, the court refused to presume that Mexican-Americans would discriminate against their own kind.

After exhausting his state remedies, respondent filed his petition for habeas corpus in the Federal District Court, alleging a denial of due process and equal protection, guaranteed by the Fourteenth Amendment, because of gross underrepresentation of Mexican-Americans on the Hidalgo County grand juries. At a hearing at which the state transcript was introduced, petitioner presented the testimony of the state judge who selected the jury commissioners who had compiled the list from which respondent's grand jury was taken. The judge first reviewed the State's grand jury selection process. In selecting the jury commissioners, the judge stated that he tried to appoint a greater number of Mexican-Americans than members of other ethnic groups. He testified that he instructed the commissioners about the qualifications of a grand juror and the exemptions provided by law. The record is silent, however, with regard to instructions dealing with the potential problem of discrimination directed against any identifiable group. The judge admitted that the actual re-

---

[9] The court noted that the foreman of the grand jury that indicted respondent was Mexican-American, and that 10 of the 20 summoned to serve had Spanish surnames. Seven of the 12 members of the petit jury that convicted him were Mexican-American. In addition, the state judge who presided over the trial was Mexican-American, as were a number of other elected officials in the county.

sults of the selection process had not produced grand jury lists that were "representative of the ethnic balance in the community." [10] App. 84. The jury commissioners themselves, who were the only ones in a position to explain the apparent substantial underrepresentation of Mexican-Americans and to provide information on the actual operation of the selection process, were never called.

On the basis of the evidence before it, the court concluded that respondent had made out a *"bare prima facie* case" of invidious discrimination with his proof of "a long continued disproportion in the composition of the grand juries in Hidalgo County." 384 F. Supp. 79, 90 (SD Tex. 1974) (emphasis in original). Based on an examination of the reliability of the statistics offered by respondent, however, despite the lack of evidence in the record justifying such an inquiry, the court stated that the prima facie case was weak. The court believed that the census statistics did not reflect the true situation accurately, because of recent changes in the Hidalgo County area and the court's own impression of the demographic characteristics of the Mexican-American community. On the other hand, the court recognized that the Texas key-man system of grand jury selection was highly subjective, and was "archaic and inefficient," *id.,* at 91, and that this was a factor arguing for less tolerance in the percentage differences. On balance, the court's doubts about the reliability of the statistics, coupled with its opinion that Mexican-Americans constituted a "governing majority" in the county, caused it to conclude that the prima facie case was rebutted. The "gov-

---

[10] The Federal District Judge observed, during the state judge's testimony, that the selection process for grand jurors in Hidalgo County typically resulted in a progressive reduction of the number of Mexican-Americans involved at each stage. See *Alexander* v. *Louisiana,* 405 U. S. 625 (1972). For example, said the court, if 60% of the jury commissioners were Mexican-American, the jury panel might be only 55%, and the actual grand jury only 43%. The court speculated that the reason for this might be cultural. App. 84–85.

erning majority" theory distinguished respondent's case from all preceding cases involving similar disparities. On the basis of those findings, the court dismissed the petition.[11]

The United States Court of Appeals for the Fifth Circuit reversed. 524 F. 2d 481 (1975). It agreed with the District Court that respondent had succeeded in making out a prima facie case. It found, however, that the State had failed to rebut that showing. The "governing majority" theory contributed little to the State's case in the absence of specific proof to explain the disparity. In light of the State's abdication of its responsibility to introduce controverting evidence, the court held that respondent was entitled to prevail.

We granted certiorari to consider whether the existence of a "governing majority" in itself can rebut a prima facie case of discrimination in grand jury selection, and, if not, whether the State otherwise met its burden of proof. 426 U. S. 934 (1976).

### III

A. This Court has long recognized that "it is a denial of the equal protection of the laws to try a defendant of a particular race or color under an indictment issued by a grand jury . . . from which all persons of his race or color have, solely because of that race or color, been excluded by the State . . . ."[12] *Hernandez* v. *Texas,* 347 U. S., at 477. See

---

[11] The court suggested that the actual discrimination operating might be economic. The jury commissioners were from the higher socio-economic classes, and they tended to select prospective jurors from among their peers. Consequently, the number of Mexican-Americans was disproportionately low, since they were concentrated at the lower end of the economic scale. We find it unnecessary to decide whether a showing of simple economic discrimination would be enough to make out a prima facie case in the absence of other evidence, since that case is not before us. Cf. *Thiel* v. *Southern Pacific Co.,* 328 U. S. 217 (1946).

[12] Cases in this Court holding unconstitutional discriminatory selection procedures in the grand jury context include *Alexander* v. *Louisiana, supra;*

*Alexander* v. *Louisiana,* 405 U. S. 625, 628 (1972); *Carter* v. *Jury Comm'n,* 396 U. S. 320, 330 (1970). See also *Peters* v. *Kiff,* 407 U. S. 493, 497 (1972) (plurality opinion); *id.,* at 507 (dissenting opinion). While the earlier cases involved absolute exclusion of an identifiable group, later cases established the principle that substantial underrepresentation of the group constitutes a constitutional violation as well, if it results from purposeful discrimination. See *Turner* v. *Fouche,* 396 U. S. 346 (1970); *Carter* v. *Jury Comm'n, supra; Whitus* v. *Georgia,* 385 U. S. 545, 552 (1967); *Swain* v. *Alabama,* 380 U. S. 202 (1965); *Cassell* v. *Texas,* 339 U. S. 282 (1950). Recent cases have established the fact that an official act is not unconstitutional *solely* because it has a racially disproportionate impact. *Washington* v. *Davis,* 426 U. S. 229, 239 (1976); see *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 264–265 (1977). Nevertheless, as the Court recognized in *Arlington Heights,* "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id.,* at 266. In *Washington* v. *Davis,* the application of these principles to the jury cases was considered:

> "It is also clear from the cases dealing with racial discrimination in the selection of juries that the systematic exclusion of Negroes is itself such an 'unequal application of the law . . . as to show intentional discrimination.' . . . A prima facie case of discriminatory purpose may be proved as well by the absence of Negroes on a particular jury combined with the failure of the jury commissioners to be informed of eligible Negro jurors in a commu-

*Arnold* v. *North Carolina,* 376 U. S. 773 (1964); *Eubanks* v. *Louisiana,* 356 U. S. 584 (1958); *Reece* v. *Georgia,* 350 U. S. 85 (1955); *Cassell* v. *Texas,* 339 U. S. 282 (1950); *Hill* v. *Texas,* 316 U. S. 400 (1942); *Smith* v. *Texas,* 311 U. S. 128 (1940); *Pierre* v. *Louisiana,* 306 U. S. 354 (1939); *Rogers* v. *Alabama,* 192 U. S. 226 (1904); *Carter* v. *Texas,* 177 U. S. 442 (1900); and *Bush* v. *Kentucky,* 107 U. S. 110 (1883).

nity, . . . or with racially non-neutral selection procedures . . . . With a prima facie case made out, 'the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result.' *Alexander* [v. *Louisiana*, 405 U. S.,] at 632." 426 U. S., at 241.

See *Arlington Heights, supra,* at 266 n. 13.

Thus, in order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. *Hernandez* v. *Texas,* 347 U. S., at 478–479. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. *Id.,* at 480. See *Norris* v. *Alabama,* 294 U. S. 587 (1935). This method of proof, sometimes called the "rule of exclusion," has been held to be available as a method of proving discrimination in jury selection against a delineated class.[13] *Hernandez* v. *Texas,* 347 U. S., at 480. Finally, as noted above, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing. *Washington* v. *Davis,* 426 U. S., at 241; *Alexander* v. *Louisiana,* 405 U. S., at 630.

---

[13] The idea behind the rule of exclusion is not at all complex. If a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process. See *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 266 n. 13 (1977); *Washington* v. *Davis,* 426 U. S. 229, 241 (1976); *Eubanks* v. *Louisiana,* 356 U. S., at 587; *Smith* v. *Texas,* 311 U. S., at 131. Cf. n. 17, *infra.*

Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case.

B. In this case, it is no longer open to dispute that Mexican-Americans are a clearly identifiable class. See, *e. g., Hernandez* v. *Texas, supra.* Cf. *White* v. *Regester,* 412 U. S. 755, 767 (1973). The statistics introduced by respondent from the 1970 census illustrate disadvantages to which the group has been subject. Additionally, as in *Alexander* v. *Louisiana,* the selection procedure is not racially neutral with respect to Mexican-Americans; Spanish surnames are just as easily identifiable as race was from the questionnaires in *Alexander* or the notations and card colors in *Whitus* v. *Georgia, supra,* and in *Avery* v. *Georgia,* 345 U. S. 559 (1953).[14]

The disparity proved by the 1970 census statistics showed that the population of the county was 79.1% Mexican-American, but that, over an 11-year period, only 39% of the persons summoned for grand jury service were Mexican-American.[15] This difference of 40% is greater than that found significant in *Turner* v. *Fouche,* 396 U. S. 346 (1970)

---

[14] The dissenters argue that the subjectivity of the system cuts in favor of the State where those who control the selection process are members of the same class as the person claiming discrimination. The fact remains, however, that the class to which respondent belongs was substantially underrepresented on the grand jury lists of Hidalgo County. The dissenters' argument here is another aspect of the "governing majority" theory, see Part III–C, *infra;* under the circumstances presented in this case, that theory does not dispel the presumption of purposeful discrimination created by the combined force of the statistical showing and the highly subjective method of selection.

[15] Since the 1960 census did not compile separate statistics for Spanish-surnamed persons, it is impossible to ascertain whether the percentage of Mexican-Americans in the county changed appreciably over the period of time at issue. We therefore are forced to rely on the assumption that the 79.1% figure remained constant.

(60% Negroes in the general population, 37% on the grand jury lists). Since the State presented no evidence showing why the 11-year period was not reliable, we take it as the relevant base for comparison.[16] The mathematical disparities that have been accepted by this Court as adequate for a prima facie case have all been within the range presented here. For example, in *Whitus* v. *Georgia*, 385 U. S. 545 (1967), the number of Negroes listed on the tax digest amounted to 27.1% of the taxpayers, but only 9.1% of those on the grand jury venire. The disparity was held to be sufficient to make out a prima facie case of discrimination. See *Sims* v. *Georgia*, 389 U. S. 404 (1967) (24.4% of tax lists, 4.7% of grand jury lists); *Jones* v. *Georgia*, 389 U. S. 24 (1967) (19.7% of tax lists, 5% of jury list). We agree with the District Court and the Court of Appeals that the proof in this case was enough to establish a prima facie case of discrimination against the Mexican-Americans in the Hidalgo County grand jury selection.[17]

---

[16] Statistical analysis of the grand jury lists during the 2½-year tenure of the State District Judge who selected the commissioners in respondent's case reveals that a significant disparity existed over this time period as well. See n. 17, *infra.* Thus, the District Court's assumption that reference to a shorter time period would show that the prima facie case of discrimination could not be proved was unwarranted.

[17] If the jurors were drawn randomly from the general population, then the number of Mexican-Americans in the sample could be modeled by a binomial distribution. See Finkelstein, The Application of Statistical Decision Theory to the Jury Discrimination Cases, 80 Harv. L. Rev. 338, 353–356 (1966). See generally P. Hoel, Introduction to Mathematical Statistics 58–61, 79–86 (4th ed. 1971); F. Mosteller, R. Rourke, & G. Thomas, Probability with Statistical Applications 130–146, 270–291 (2d ed. 1970). Given that 79.1% of the population is Mexican-American, the expected number of Mexican-Americans among the 870 persons summoned to serve as grand jurors over the 11-year period is approximately 688. The observed number is 339. Of course, in any given drawing some fluctuation from the expected number is predicted. The important point, however, is that the statistical model shows that the results of a random drawing are likely to fall in the vicinity of the expected value. See F. Mosteller, R. Rourke, & G. Thomas, *supra,* at 270–290. The measure of

Supporting this conclusion is the fact that the Texas system of selecting grand jurors is highly subjective. The facial constitutionality of the key-man system, of course, has been accepted by this Court. See, *e. g., Carter* v. *Jury Comm'n,* 396 U. S. 320 (1970); *Akins* v. *Texas,* 325 U. S. 398 (1945); *Smith* v. *Texas,* 311 U. S. 128 (1940). Nevertheless, the Court has noted that the system is susceptible of abuse as applied.[18] See *Hernandez* v. *Texas,* 347 U. S., at 479. Additionally, as noted, persons with Spanish surnames are readily identifiable.

The showing made by respondent therefore shifted the burden of proof to the State to dispel the inference of in-

---

the predicted fluctuations from the expected value is the standard deviation, defined for the binomial distribution as the square root of the product of the total number in the sample (here 870) times the probability of selecting a Mexican-American (0.791) times the probability of selecting a non-Mexican-American (0.209). *Id.,* at 213. Thus, in this case the standard deviation is approximately 12. As a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist. The 11-year data here reflect a difference between the expected and observed number of Mexican-Americans of approximately 29 standard deviations. A detailed calculation reveals that the likelihood that such a substantial depature from the expected value would occur by chance is less than 1 in $10^{140}$.

The data for the 2½-year period during which the State District Judge supervised the selection process similarly support the inference that the exclusion of Mexican-Americans did not occur by chance. Of 220 persons called to serve as grand jurors, only 100 were Mexican-Americans. The expected Mexican-American representation is approximately 174 and the standard deviation, as calculated from the binomial model, is approximately six. The discrepancy between the expected and observed values is more than 12 standard deviations. Again, a detailed calculation shows that the likelihood of drawing not more than 100 Mexican-Americans by chance is negligible, being less than 1 in $10^{25}$.

[18] It has been said that random selection methods similar to the federal system would probably avoid most of the potential for abuse found in the key-man system. See Sperlich & Jaspovice, *supra,* n. 1.

tentional discrimination. Inexplicably, the State introduced practically no evidence. The testimony of the State District Judge dealt principally with the selection of the jury commissioners and the instructions given to them. The commissioners themselves were not called to testify. A case such as *Swain* v. *Alabama,* 380 U. S., at 207 n. 4, 209, illustrates the potential usefulness of such testimony, when it sets out in detail the procedures followed by the commissioners.[19] The opinion of the Texas Court of Criminal Appeals is particularly revealing as to the lack of rebuttal evidence in the record:

> "How many of those listed in the census figures with Mexican-American names were not citizens of the state, but were so-called 'wet-backs' from the south side of the Rio Grande; how many were migrant workers and not residents of Hidalgo County; how many were illiterate and could not read and write; how many were not of sound mind and good moral character; how many had been convicted of a felony or were under indictment or legal accusation for theft or a felony; *none of these facts appear in the record.*" 506 S. W. 2d, at 211 (emphasis added).

In fact, the census figures showed that only a small part of the population reported for Hidalgo County was not native born. See n. 6, *supra.* Without some testimony from the grand jury commissioners about the method by which they determined the other qualifications for grand jurors prior to the statutory time for testing qualifications, it is impossible

---

[19] This is not to say, of course, that a simple protestation from a commissioner that racial considerations played no part in the selection would be enough. This kind of testimony has been found insufficient on several occasions. *E. g., Alexander* v. *Louisiana,* 405 U. S., at 632; *Hernandez* v. *Texas,* 347 U. S. 475, 481 (1954); *Norris* v. *Alabama,* 294 U. S. 587, 598 (1935). Neither is the State entitled to rely on a presumption that the officials discharged their sworn duties to rebut the case of discrimination. *Jones* v. *Georgia,* 389 U. S. 24 (1967).

to draw any inference about literacy, sound mind and moral character, and criminal record from the statistics about the population as a whole. See n. 8, *supra*. These are questions of disputed fact that present problems not amenable to resolution by an appellate court. We emphasize, however, that we are not saying that the statistical disparities proved here could never be explained in another case; we are simply saying that the State did not do so in this case. See *Turner* v. *Fouche,* 396 U. S., at 361.

C. In light of our holding that respondent proved a prima facie case of discrimination that was not rebutted by any of the evidence presently in the record, we have only to consider whether the District Court's "governing majority" theory filled the evidentiary gap. In our view, it did not dispel the presumption of purposeful discrimination in the circumstances of this case. Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group. Indeed, even the dissent of MR. JUSTICE POWELL does not suggest that such a presumption would be appropriate. See *post,* at 514–516, n. 6, 516 n. 7. The problem is a complex one, about which widely differing views can be held, and, as such, it would be somewhat precipitate to take judicial notice of one view over another on the basis of a record as barren as this.[20]

Furthermore, the relevance of a governing majority of elected officials to the grand jury selection process is questionable. The fact that certain elected officials are Mexican-American demonstrates nothing about the motivations and methods of the grand jury commissioners who select persons for grand jury lists. The only arguably relevant fact in this

---

[20] This is not a case where a majority is practicing benevolent discrimination in favor of a traditionally disfavored minority, although that situation illustrates that motivations not immediately obvious might enter into discrimination against "one's own kind."

record on the issue is that three of the five jury commissioners in respondent's case were Mexican-American. Knowing only this, we would be forced to rely on the reasoning that we have rejected—that human beings would not discriminate against their own kind—in order to find that the presumption of purposeful discrimination was rebutted. Without the benefit of this simple behavioral presumption, discriminatory intent can be rebutted only with evidence in the record about the way in which the commissioners operated and their reasons for doing so. It was the State's burden to supply such evidence, once respondent established his prima facie case. The State's failure in this regard leaves unchallenged respondent's proof of purposeful discrimination.

Finally, even if a "governing majority" theory has general applicability in cases of this kind, the inadequacy of the record in this case does not permit such an approach. Among the evidentiary deficiencies are the lack of any indication of how long the Mexican-Americans have enjoyed "governing majority" status, the absence of information about the relative power inherent in the elective offices held by Mexican-Americans, and the uncertain relevance of the general political power to the specific issue in this case. Even for the most recent time period, when presumably the political power of Mexican-Americans was at its greatest, the discrepancy between the number of Mexican-Americans in the total population and the number on the grand jury lists was substantial. Thus, under the facts presented in this case, the "governing majority" theory is not developed fully enough to satisfy the State's burden of rebuttal.

## IV

Rather than relying on an approach to the jury discrimination question that is as faintly defined as the "governing majority" theory is on this record, we prefer to look at all the facts that bear on the issue, such as the statistical disparities, the method of selection, and any other relevant testimony as

to the manner in which the selection process was implemented. Under this standard, the proof offered by respondent was sufficient to demonstrate a prima facie case of discrimination in grand jury selection. Since the State failed to rebut the presumption of purposeful discrimination by competent testimony, despite two opportunities to do so, we affirm the Court of Appeals' holding of a denial of equal protection of the law in the grand jury selection process in respondent's case.

*It is so ordered.*

Mr. Justice Marshall, concurring.

I join fully Mr. Justice Blackmun's sensitive opinion for the Court. I feel compelled to write separately, however, to express my profound disagreement with the views expressed by Mr. Justice Powell in his dissent.

As my Brother Powell observes, *post,* at 507–508, there are three categories of evidence in this case that bear on the ultimate question whether respondent "demonstrated by a preponderance of the evidence that the State had 'deliberately and systematically den[ied] to members of [respondent's class] the right to participate as jurors in the administration of justice,' " *post,* at 517, quoting *Alexander* v. *Louisiana,* 405 U. S. 625, 628–629 (1972). First, there is the statistical evidence. That evidence reveals that for at least 10 years, Mexican-Americans have been grossly underrepresented on grand juries in Hidalgo County. As Mr. Justice Blackmun demonstrates, *ante,* at 496–497, n. 17, it is all but impossible that this sizable disparity was produced by chance. The statistical evidence, then, at the very least supports an inference that Mexican-Americans were discriminated against in the choice of grand jurors.

Second, there is testimony concerning the grand jury selection system employed in this case. That testimony indicates that the commissioners who constructed the grand jury panels

had ample opportunity to discriminate against Mexican-Americans, since the selection system is entirely discretionary and since Spanish-surnamed persons are readily identified. Indeed, for over 35 years this Court has recognized the potential for abuse inherent in the Texas grand jury selection plan. See *Smith* v. *Texas,* 311 U. S. 128, 130 (1940); *Hill* v. *Texas,* 316 U. S. 400, 404 (1942); *Cassell* v. *Texas,* 339 U. S. 282, 289 (1950); *Hernandez* v. *Texas,* 347 U. S. 475, 479 (1954). Thus the testimony concerning the selection system, by itself, only buttresses the inference of purposeful discrimination suggested by the statistics.

In every other case of which I am aware where the evidence showed both statistical disparity and discretionary selection procedures, this Court has found that a prima facie case of discrimination was established, and has required the State to explain how ostensibly neutral selection procedures had produced such nonneutral results. This line of cases begins with the decision almost a century ago in *Neal* v. *Delaware,* 103 U. S. 370 (1881), and extends to our recent decision in *Alexander* v. *Louisiana, supra.*[1] Yet my Brother POWELL would have us conclude that the evidence here was insufficient to establish purposeful discrimination, even though no explanation has been offered for the marked underrepresentation of Mexican-Americans on Hidalgo County grand juries.

---

[1] See also *Norris* v. *Alabama,* 294 U. S. 587 (1935); *Hale* v. *Kentucky,* 303 U. S. 613 (1938); *Pierre* v. *Louisiana,* 306 U. S. 354 (1939); *Smith* v. *Texas,* 311 U. S. 128 (1940); *Hill* v. *Texas,* 316 U. S. 400 (1942); *Patton* v. *Mississippi,* 332 U. S. 463 (1947); *Cassell* v. *Texas,* 339 U. S. 282 (1950); *Hernandez* v. *Texas,* 347 U. S. 475 (1954); *Eubanks* v. *Louisiana,* 356 U. S. 584 (1958); *Arnold* v. *North Carolina,* 376 U. S. 773 (1964); *Whitus* v. *Georgia,* 385 U. S. 545 (1967); *Jones* v. *Georgia,* 389 U. S. 24 (1967); *Sims* v. *Georgia,* 389 U. S. 404 (1967); *Turner* v. *Fouche,* 396 U. S. 346 (1970).

In *Akins* v. *Texas,* 325 U. S. 398 (1945), the statistical evidence involved only two grand jury panels; in *Swain* v. *Alabama,* 380 U. S. 202 (1965), the statistical disparity was small, and the methods of selection were explained.

The sole basis for MR. JUSTICE POWELL's conclusion lies in the third category of evidence presented: proof of "the political dominance and control by the Mexican-American majority in Hidalgo County," *post,* at 507–508. Like the District Court, he appears to assume—without any basis in the record—that *all* Mexican-Americans, indeed *all* members of *all* minority groups, have an "inclination to assure fairness" to other members of their group. *Post,* at 516. Although he concedes the possibility that minority group members will violate this "inclination," see *post,* at 514–515, n. 6, he apparently regards this possibility as more theoretical than real. Thus he would reject the inference of purposeful discrimination here absent any alternative explanation for the disparate results. I emphatically disagree.

In the first place, MR. JUSTICE POWELL's assumptions about human nature, plausible as they may sound, fly in the face of a great deal of social science theory and research. Social scientists agree that members of minority groups frequently respond to discrimination and prejudice by attempting to disassociate themselves from the group, even to the point of adopting the majority's negative attitudes towards the minority.[2] Such behavior occurs with particular frequency among members of minority groups who have achieved some measure of economic or political success and thereby have gained some acceptability among the dominant group.[3]

[2] G. Allport, The Nature of Prejudice 150–153 (1954); A. Rose, The Negro's Morale 85–95 (1949); G. Simpson & J. Yinger, Racial and Cultural Minorities 192–195, 227, 295 (4th ed. 1972); Bettelheim, Individual and Mass Behavior in Extreme Situations, 38 J. Abnormal & Social Psych. 417 (1943); cf. *Brown* v. *Board of Education,* 347 U. S. 483, 494, and n. 11 (1954) (noting the impact on sense of self of *de jure* segregation in schools).

[3] E. Frazier, Black Bourgeoisie 213–216 (1957); Simpson & Yinger, *supra,* at 209; A. Kardiner & L. Ovesey, The Mark of Oppression 313–316 (1962); Lewin, Self-Hatred Among Jews, 4 Contemporary Jewish Record 219 (1941).

But even if my Brother POWELL's behavioral assumptions were more valid, I still could not agree to making them the foundation for a constitutional ruling. It seems to me that especially in reviewing claims of intentional discrimination, this Court has a solemn responsibility to avoid basing its decisions on broad generalizations concerning minority groups. If history has taught us anything, it is the danger of relying on such stereotypes. The question for decision here is not how Mexican-Americans treat other Mexican-Americans, but how the particular grand jury commissioners in Hidalgo County acted. The only reliable way to answer that question, as we have said so many times,[4] is for the State to produce testimony concerning the manner in which the selection process operated. Because the State failed to do so after respondent established a prima facie case of discrimination, I join the Court's opinion affirming the Court of Appeals.

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST join, dissenting.

In addition to the views expressed in MR. JUSTICE POWELL's dissent, I identify one other flaw in the Court's opinion. What the majority characterizes as a prima facie case of discrimination simply will not "wash." The decisions of this Court suggest, and common sense demands, that *eligible* population statistics, not gross population figures, provide the relevant starting point. In *Alexander* v. *Louisiana*, 405 U. S. 625, 630 (1972), for example, the Court in an opinion by MR. JUSTICE WHITE looked to the "proportion of blacks in the *eligible* population . . . ." (Emphasis supplied.)

The failure to produce evidence relating to the eligible population in Hidalgo County undermines respondent's claim that any statistical "disparity" existed in the first instance. Particularly where, as here, substantial numbers of members

---

[4] *E. g., Norris* v. *Alabama, supra,* at 592; *Pierre* v. *Louisiana, supra,* at 361; *Alexander* v. *Louisiana,* 405 U. S., at 631.

of the identifiable class actually served on grand jury panels, the burden rightly rests upon the challenger to show a meaningful statistical disparity.   After all, the presumption of constitutionality attaching to all state procedures has even greater force under the circumstances presented here, where exactly one-half the members of the grand jury list now challenged by respondent were members of the allegedly excluded class of Mexican-Americans.

The Court has not previously been called upon to deal at length with the sort of statistics required of persons challenging a grand jury selection system.   The reason is that in our prior cases there was little doubt that members of identifiable minority groups had been excluded in large numbers.   In *Alexander* v. *Louisiana, supra,* the challenger's venire included only one member of the identifiable class and the grand jury that indicted him had none.   In *Turner* v. *Fouche,* 396 U. S. 346 (1970); *Jones* v. *Georgia,* 389 U. S. 24 (1967); *Sims* v. *Georgia,* 389 U. S. 404 (1967); and *Whitus* v. *Georgia,* 385 U. S. 545 (1967), there was at best only token inclusion of Negroes on grand jury lists.   The case before us, in contrast, involves neither tokenism nor absolute exclusion; rather, the State has used a selection system resulting in the inclusion of large numbers of Spanish-surnamed citizens on grand jury lists.   In this situation, it is particularly incumbent on respondent to adduce precise statistics demonstrating a significant disparity.   To do that, respondent was obligated to demonstrate that disproportionately large numbers of eligible individuals were excluded systematically from grand jury service.

Respondent offered no evidence whatever in this respect. He therefore could not have established any meaningful case of discrimination, prima facie or otherwise.   In contrast to respondent's approach, which the Court's opinion accepts without analysis, the Census Bureau's statistics for 1970 demonstrate that of the *adults* in Hidalgo County, 72%, not

79.1% as respondent implies, are Spanish surnamed. At the outset, therefore, respondent's gross population figures are manifestly overinclusive.

But that is only the beginning. Respondent offered no evidence whatever with respect to other basic qualifications for grand jury service.[1] The statistics relied on in the Court's opinion suggest that 22.9% of Spanish-surnamed persons over age 25 in Hidalgo County have had no schooling at all. *Ante,* at 488–489, n. 8. Since one requirement of grand jurors in Texas is literacy in the English language, approximately 20% of adult-age Mexican-Americans are very likely disqualified on that ground alone.

The Court's reliance on respondent's overbroad statistics is not the sole defect. As previously noted, one-half of the members of respondent's grand jury list bore Mexican-American surnames. Other grand jury lists at about the same time as respondent's indictment in March 1972 were *predominantly Mexican-American.* Thus, with respect to the September 1971 grand jury list, 70% of the prospective grand jurors were Mexican-American. In the January 1972 Term, 55% were Mexican-American. Since respondent was indicted in 1972, by what appears to have been a truly representative grand jury, the mechanical use of Hidalgo County's practices some 10 years earlier seems to me entirely indefensible. We do not know, and on this record we cannot know, whether respondent's 1970 gross population figures, which served as the basis for establishing the "disparity" complained of in this case, had any applicability at all to the period prior to 1970. Accordingly, for all we know, the 1970 figures may be totally

---

[1] The burden of establishing a prima facie case obviously rested on respondent. It will not do to produce patently overinclusive figures and thereby seek to shift the burden to the State. Cf. *ante,* at 486–487, n. 6, 488–489, n. 8. Rather, a prima facie case is established only when the challenger shows a disparity between the percentage of minority persons in the eligible population and the percentage of minority individuals on the grand jury.

inaccurate as to prior years;[2] if so, the apparent disparity alleged by respondent would be increased improperly.

Therefore, I disagree both with the Court's assumption that respondent established a prima facie case and with the Court's implicit approval of respondent's method for showing an allegedly disproportionate impact of Hidalgo County's selection system upon Mexican-Americans.

MR. JUSTICE STEWART, dissenting.

In my view, the findings of the District Court in this case cannot be said to be "clearly erroneous." Fed. Rule Civ. Proc. 52 (a); *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 394–395.* Given those findings, there was no constitutional violation in the selection of the grand jury that indicted the respondent. Upon that basis I would reverse the judgment of the Court of Appeals. I add only that I am in substantial agreement with the dissenting opinions of THE CHIEF JUSTICE and MR. JUSTICE POWELL.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

The evidence relevant to the issue of discrimination in this case falls into three categories: First, the statistical evidence introduced by respondent in both the state and federal proceedings which shows that the 80% Mexican-American majority in Hidalgo County was not proportionately represented on the grand jury lists; second, the testimony of the state trial judge outlining the Texas grand jury selection system as it operated in this case; and third, the facts judicially noticed by the District Court with respect to the political

---

[2] Indeed, Judge Reynaldo Garza in this case referred to Hidalgo County as "rapidly changing" and as experiencing "rapid growth."

*The "clearly erroneous" standard applies to the review of facts found by a district court in a habeas corpus proceeding. *Wade* v. *Mayo*, 334 U. S. 672, 683–684.

dominance and control by the Mexican-American majority in Hidalgo County.

The Court today considers it dispositive that the lack of proportional representation of Mexican-Americans on the grand jury lists in this county would not have occurred if jurors were selected from the population wholly at random. But one may agree that the disproportion did not occur by chance without agreeing that it resulted from purposeful invidious discrimination. In my view, the circumstances of this unique case fully support the District Court's finding that the statistical disparity—the basis of today's decision—is more likely to have stemmed from neutral causes than from any intent to discriminate against Mexican-Americans.[1]

### A

The Court holds that a criminal defendant may demonstrate a violation of the Equal Protection Clause merely by showing that the procedure for selecting grand jurors "resulted in substantial underrepresentation of his race or of

---

[1] A strong case may be made that claims of grand jury discrimination are not cognizable on federal habeas corpus after *Stone* v. *Powell*, 428 U. S. 465 (1976). In *Stone* we held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.*, at 494 (footnotes omitted). Unlike the prisoner in *Stone*, who could complain that his conviction rested on evidence tainted by Fourth Amendment violations and could ask for a new trial with that evidence excluded, the prisoner in this case challenges only the now moot determination by the grand jury that there was sufficient cause to proceed to trial. He points to no flaw in the trial itself. As in *Stone*, the incremental benefit of extending habeas corpus as a means of correcting unconstitutional grand jury selection procedures might be viewed as "outweighed by the acknowledged costs to other values vital to a rational system of criminal justice." *Ibid.*

But as this issue was not addressed below and was not briefed or argued in this Court, it would be inappropriate to resolve it in this case.

the identifiable group to which he belongs." *Ante,* at 494. By so holding, the Court blurs the traditional constitutional distinctions between grand and petit juries, and misapplies the equal protection analysis mandated by our most recent decisions.

The Fifth Amendment right to a grand jury does not apply to a state prosecution. *Hurtado* v. *California,* 110 U. S. 516 (1884). A state defendant cannot complain if the State forgoes the institution of the grand jury and proceeds against him instead through prosecutorial information, as many States prefer to do. See *Gerstein* v. *Pugh,* 420 U. S. 103, 116–119 (1975). Nevertheless, if a State chooses to proceed by grand jury it must proceed within the constraints imposed by the Equal Protection Clause of the Fourteenth Amendment. Thus in a line of cases beginning with *Strauder* v. *West Virgina,* 100 U. S. 303 (1880), this Court has held that a criminal defendant is denied equal protection of the law if, as a result of *purposeful* discrimination, members of his own race are excluded from jury service. See, *e. g., Alexander* v. *Louisiana,* 405 U. S. 625, 628–629 (1972); *Carter* v. *Jury Comm'n,* 396 U. S. 320, 335–337, 339 (1970); *Cassell* v. *Texas,* 339 U. S. 282, 287 (1950); *Akins* v. *Texas,* 325 U. S. 398, 403–404 (1945). As the Court points out, this right is applicable where purposeful discrimination results only in substantial rather than total exclusion of members of the defendant's class, see, *e. g., Turner* v. *Fouche,* 396 U. S. 346 (1970).

But a state defendant has no right to a grand jury that reflects a fair cross-section of the community.[2] The right

---

[2] It may be that nondiscriminatory methods of selection will, over time, result in a representative grand jury. See *Carter* v. *Jury Comm'n,* 396 U. S. 320, 330 (1970). But the Fourteenth Amendment does not mandate that result. Nothing would prevent a State for example, from seeking to assure informed decisionmaking by requiring that all grand jurors be lawyers familiar with the criminal law; and if that requirement should result in substantial underrepresentation on grand juries of some segments

to a "representative" grand jury is a federal right that derives not from the requirement of equal protection but from the Fifth Amendment's explicit requirement of a grand jury. That right is similar to the right—applicable to state proceedings—to a representative petit jury under the Sixth Amendment. See *Taylor* v. *Louisiana,* 419 U. S. 522 (1975). To the extent that the Fifth and Sixth Amendments are applicable, a defendant need only show that the jury selection procedure "systematically exclude[s] distinctive groups in the community and thereby fail[s] to be reasonably representative thereof." *Id.,* at 538. But in a state case in which the challenge is to the grand jury, only the Fourteenth Amendment applies, and the defendant has the burden of proving a violation of the Equal Protection Clause.

Proof of discriminatory intent in such a case was explicitly mandated in our recent decisions in *Washington* v. *Davis,* 426 U. S. 229 (1976), and *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252 (1977). In *Arlington Heights* we said:

"Our decision last Term in *Washington* v. *Davis,* 426 U. S. 229 (1976), made it clear that official action will not be held unconstitutional solely because it results in a racially disproportionate impact. 'Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination.' *Id.,* at 242. Proof of a racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. . . ." *Id.,* at 264–265.

We also identified the following standards for resolving issues of discriminatory intent or purpose:

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry

---

of the community in some areas of the State, the Fourteenth Amendment would not render the selection process unconstitutional.

into such circumstantial and direct evidence of intent as may be available. The impact of the official action—whether it 'bears more heavily on one race than other,' *Washington* v. *Davis, supra,* at 242—may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886); *Guinn* v. *United States,* 238 U. S. 347 (1915); *Lane* v. *Wilson,* 307 U. S. 268 (1939); *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960). The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo,* impact alone is not determinative, and the Court must look to other evidence." *Id.,* at 266 (footnotes omitted).

The analysis is essentially the same where the alleged discrimination is in the selection of a state grand jury.[3] This is

---

[3] Although *Davis* and *Arlington Heights* make clear that proof of discriminatory intent is required and that proof of impact or effect alone is not sufficient, we did recognize in *Arlington Heights* that a lesser burden may be appropriate in the context of jury selection. "Because of the nature of the jury-selection task . . . we have permitted a finding of constitutional violation even when the statistical pattern does not approach the extremes of *Yick Wo* or *Gomillion.*" 429 U. S., at 266 n. 13. As one illustration, we cited *Turner* v. *Fouche,* 396 U. S. 346 (1970).

In *Turner* the statistical evidence showed that Negroes constituted 60% of the general population and 37% of those included in the grand jury list. The Court found that the disparity between those figures was not so "insubstantial" as to foreclose corrective action by a federal court. *Id.,* at 359. But the Court did not view the statistics in isolation. *Turner* was not a criminal case; it involved instead Georgia's peculiar system of appointing the county board of education. The circuit judge appointed jury commissioners, who in turn selected the grand jury. The grand jury, in turn, selected the board of education. At every layer of this system white citizens were in total control. Even though all of the students in

illustrated by the recent decision in *Alexander* v. *Louisiana, supra,* where we stated:

"This Court has never announced mathematical standards for the demonstration of 'systematic' exclusion of blacks but has, rather, emphasized that a factual inquiry is necessary in each case that takes into account all possible explanatory factors. The progressive decimation of potential Negro grand jurors is indeed striking here, but we do not rest our conclusion that petitioner has demonstrated a prima facie case of invidious racial discrimination on statistical improbability alone, for the selection procedures themselves were not racially neutral. . . ." 405 U. S., at 630.

In *Alexander,* the evidence showed that 21% of the relevant community was Negro; the jury commission consisted of five members "all of whom were white," appointed by a white judge; the grand jury venire included 20 persons, only one of whom was a Negro (5%); and none of the 12 persons on the grand jury that indicted the defendant was Negro. *Id.,* at 627, 628. This statistical array was—as the Court noted— "striking." Yet the statistics were not found, in isolation, to constitute a prima facie case. Only after determining that the selection system "provided a clear and easy opportunity

the county schools were Negro, every white pupil having transferred elsewhere, all of the members of the board of education were white, as were all of the members of the jury commission. The District Court had found that, until the suit was instituted, "Negroes had been systematically excluded from the grand juries through token inclusion." *Id.,* at 352. It was against this background of pervasive discrimination that the Court found that even a new grand jury list with 37% Negro representation was the product of continued, purposeful discrimination.

By contrast, in *Carter* v. *Jury Comm'n, supra,* at 338–339, isolated proof that for 12 years no Negro had been appointed to the jury commission of a predominantly Negro county was found insufficient, standing alone, to establish discriminatory intent.

for racial discrimination" was the Court satisfied that the burden should shift to the State. *Id.,* at 630.[4]

Considered together, *Davis, Arlington Heights,* and *Alexander* make clear that statistical evidence showing underrep-

---

[4] The Court's reliance on the "opportunity for discrimination" noted in *Alexander, ante,* at 495, 497, is clearly misplaced. The Court has held repeatedly that the Texas system of selecting grand jurors by the use of jury commissioners is "fair on its face and capable of being utilized without discrimination." *Hernandez v. Texas,* 347 U. S. 475, 478–479 (1954); accord, *Smith v. Texas,* 311 U. S. 128, 130 (1940). The "subjectivity" of the selection system cuts in favor of the State where, as here, those who control the selection process are members of the same class as the person claiming discrimination. See text, *infra,* at 515–516.

Apart from *Alexander* and *Turner,* see n. 3, *supra,* this Court has sustained claims of grand jury discrimination in two situations. Most of the cases involve total exclusion of minorities from participation on grand juries: *Reece v. Georgia,* 350 U. S. 85 (1955) (no Negro jurors in 18 years); *Hernandez v. Texas, supra* (no Mexican-American jurors in 25 years); *Patton v. Mississippi,* 332 U. S. 463 (1947) (no Negro jurors in 30 years); *Hill v. Texas,* 316 U. S. 400 (1942) (no Negro grand jurors in 16 years or more); *Pierre v. Louisiana,* 306 U. S. 354 (1939) (no Negro grand jurors in 20 years); *Hale v. Kentucky,* 303 U. S. 613 (1938) (no Negro jurors); *Norris v. Alabama,* 294 U. S. 587 (1935) (no Negro jurors in a "long number" of years); *Rogers v. Alabama,* 192 U. S. 226 (1904) (no Negro jurors); *Carter v. Texas,* 177 U. S. 442 (1900) (no Negro jurors); *Bush v. Kentucky,* 107 U. S. 110 (1883) (no Negro jurors); *Neal v. Delaware,* 103 U. S. 370 (1881) (no Negro jurors); *Strauder v. West Virginia,* 100 U. S. 303 (1880) (no Negro jurors). The remainder of the cases involve severe limitation of a minority's participation by token inclusion: *Sims v. Georgia,* 389 U. S. 404 (1967) (Negroes constituting 24.4% of the taxpayers limited to 4.7% of those on the grand jury list); *Jones v. Georgia,* 389 U. S. 24 (1967) (Negroes constituting 19.7% of the taxpayers limited to 5% of those on the jury list); *Whitus v. Georgia,* 385 U. S. 545 (1967) (Negroes constituting 27.1% of the taxpayers limited to 9.1% of the grand jury venire); *Arnold v. North Carolina,* 376 U. S. 773 (1964) (one Negro juror in 24 years); *Eubanks v. Louisiana,* 356 U. S. 584 (1958) (one Negro juror in 18 years); *Cassell v. Texas,* 339 U. S. 282 (1950) (limitation of one Negro juror on each panel); *Smith v. Texas, supra* (five Negro grand jurors in a 7-year period).

resentation of a population group on the grand jury lists should be considered in light of "such [other] circumstantial and direct evidence of intent as may be available." *Arlington Heights,* 429 U. S., at 266.

## B

In this case, the following critical facts are beyond dispute: the judge who appointed the jury commissioners and later presided over respondent's trial was Mexican-American; three of the five jury commissioners were Mexican-American; 10 of the 20 members of the grand jury array were Mexican-American; 5 of the 12 grand jurors who returned the indictment, including the foreman, were Mexican-American,[5] and 7 of the 12 petit jurors who returned the verdict of guilt were Mexican-American. In the year in which respondent was indicted, 52.5% of the persons on the grand jury list were Mexican-American. In addition, a majority of the elected officials in Hidalgo County were Mexican-American, as were a majority of the judges. That these positions of power and influence were so held is not surprising in a community where 80% of the population is Mexican-American. As was emphasized by District Judge Garza, the able Mexican-American jurist who presided over the habeas proceedings in the District Court, this case *is* unique. Every other jury discrimination case reaching this Court has involved a situation where the governing majority, and the resulting power over the jury selection process, was held by a white electorate and white officials.[6]

---

[5] The District Court noted that the number of Mexican-Americans on the grand jury might have been higher had it not been for the inability of the sheriff, a Mexican-American, to locate four of the original members of the array who were Mexican-American. 384 F. Supp. 79, 83. Under Texas law, 9 of the 12 grand jurors must concur before an indictment can be presented. Tex. Code Crim. Proc., Art. 20.19 (1966).

[6] I do not suggest, of course, that the mere fact that Mexican-Americans constitute a majority in Hidalgo County is dispositive. There are many communities in which, by virtue of historical or other reasons,

The most significant fact in this case, all but ignored in the Court's opinion, is that a majority of the jury commissioners were Mexican-American. The jury commission is the body vested by Texas law with the authority to select grand jurors. Under the Texas selection system, as noted by the Court, *ante*, at 484–485, 497, the jury commission has the opportunity to identify in advance those potential jurors who have Spanish surnames. In these circumstances, where Mexican-Americans control both the selection of jurors and the political process, rational inferences from the most basic facts in a democratic society render improbable respondent's claim of an intent to discriminate against him and other Mexican-Americans. As Judge Garza observed: "If people in charge can choose whom they want, it is unlikely they will discriminate against themselves." 384 F. Supp. 79, 90.

That individuals are more likely to discriminate in favor of, than against, those who share their own identifiable attributes is the premise that underlies the cases recognizing that the criminal defendant has a personal right under the Fourteenth Amendment not to have members of his own class excluded from jury service. Discriminatory exclusion of members of the defendant's class has been viewed as unfairly excluding persons who may be inclined to favor the defendant. See

a majority of the population may not be able at a particular time to control or significantly influence political decisions or the way the system operates. See *Turner* v. *Fouche*, 396 U. S. 346 (1970). But no one can contend seriously that Hidalgo County is such a community. The classic situation in which a "minority group" may suffer discrimination in a community is where it is "relegated to . . . a position of political powerlessness." *San Antonio School Dist.* v. *Rodriguez*, 411 U. S. 1, 28 (1973). Here the Mexican-Americans are not politically "powerless"; they *are* the majoritarian political element of the community, with demonstrated capability to elect and protect their own.

Nor do I suggest that persons in positions of power can never be shown to have discriminated against other members of the same ethnic

*Strauder* v. *West Virginia,* 100 U. S., at 309. Were it not for the perceived likelihood that jurors will favor defendants of their own class, there would be no reason to suppose that a jury selection process that systematically excluded persons of a certain race would be the basis of any legitimate complaint by criminal defendants of that race. Only the individuals excluded from jury service would have a personal right to complain.

In *Akins* v. *Texas,* where apparently no Negro was on the jury commission and only 1 of 16 was on the jury panel, the Court emphasized the high threshold of proof required to brand officers of the court with discriminatory intent:

> "An allegation of discriminatory practices in selecting a grand jury panel challenges an essential element of proper judicial procedure—the requirement of fairness on the part of the judicial arm of government in dealing with persons charged with criminal offenses. It cannot lightly be concluded that officers of the courts disregard this accepted standard of justice." 325 U. S., at 400–401.

With all respect, I am compelled to say that the Court today *has* "lightly" concluded that the grand jury commissioners of this county have disregarded not only their sworn duty but also their likely inclination to assure fairness to Mexican-Americans.[7]

---

or racial group. I would hold only that respondent's statistical evidence, without more, is insufficient to prove a claim of discrimination in this case.

[7] I agree with Mr. Justice Marshall, *ante,* at 504, that stereotypes concerning identifiable classes in our society have no place in the decisions of this Court. For that reason, I consider it inappropriate to characterize the Mexican-American majority in Hidalgo County as a "minority group" and on that basis to suggest that these Mexican-Americans may have "adopt[ed] the majority's negative attitudes towards the minority." *Ante,* at 503. This type of speculation illustrates the lengths to which one must go to buttress a holding of purposeful discrimination that otherwise is based solely on a lack of proportional representation.

## C

It matters little in this case whether such judicially noticeable facts as the composition of the grand jury commission are viewed as defeating respondent's prima facie case at the outset or as rebutting it after it was established by statistical evidence. The significance of the prima facie case is limited to its effect in shifting the burden of going forward to the State. Once the State has produced evidence—either by presenting proof or by calling attention to facts subject to judicial notice—the only question is whether the evidence in the record is sufficient to demonstrate deliberate and systematic discrimination in the jury selection process.

Here, respondent produced statistics showing that Mexican-Americans—while substantially represented on the grand jury lists—were not represented in numbers proportionate to their share of the total population. The State responded by presenting the testimony of the judge who appointed the grand jury commissioners. Other facts, such as the presence of Mexican-Americans in a majority of the elective positions of the county, entered the record through judicial notice. The testimony, together with the facts noted by the District Court, sufficed to satisfy the State's burden of production—even assuming that respondent's evidence was sufficient to give rise to such a burden. Accordingly, at the close of the evidence, the question for the District Court was whether respondent had demonstrated by a preponderance of the evidence that the State had "deliberately and systematically den[ied] to members of [respondent's class] the right to participate as jurors in the administration of justice." *Alexander*, 405 U. S., at 628–629. The District Court found that the judge and jury commissioners had not intentionally discriminated against Mexican-Americans. 384 F. Supp., at 90. At the very least, that finding was not clearly erroneous.[8]

---

[8] Nothing in this case remotely resembles the stark discrimination in *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960), and *Yick Wo* v. *Hopkins*,

The Court labels it "inexplicable" that the State introduced only the testimony of the state trial judge. *Ante,* at 498. Perhaps the State fairly may be faulted for not presenting more evidence than it did. But until today's decision one may doubt whether many lawyers, familiar with our cases, would have thought that respondent's statistics, under the circumstances of this case and prevailing in Hidalgo County, were even arguably sufficient to establish deliberate and systematic discrimination.

There is for me a sense of unreality when Justices here in Washington decide solely on the basis of inferences from statistics that the Mexican-Americans who control the levers of power in this remote border county are manipulating them to discriminate "against themselves." In contrast, the judges on the scene, the state judge who appointed the jury commissioners and presided over respondent's trial and the United States District Judge—both Mexican-Americans and familiar with the community—perceived no basis for respondent's claim of invidious discrimination.

It seems to me that the Court today, in rejecting the District Court's finding that no such discrimination took place, has erred grievously. I would reinstate the judgment of the District Court.

---

118 U. S. 356 (1886). Nor do the statistics in this case approach the degree of exclusion that has characterized the cases in which we have previously found grand jury discrimination. See n. 4, *supra.* In this case, in the year in which the respondent was indicted, 52.5% of the persons on the grand jury lists were Mexican-American. *Ante,* at 487 n. 7. In its preoccupation with the disparity of representation of Mexican-Americans in the total population and on the grand jury lists, the Court loses sight of the constitutional standard. Respondent has no right to "proportional representation" of Mexican-Americans, *Carter* v. *Jury Comm'n,* 396 U. S., at 339. He has only the right "to require that the State not deliberately and systematically deny to [Mexican-Americans] the right to participate as jurors in the administration of justice." *Alexander,* 405 U. S., at 628–629.