**Jose ECCLESTON, Plaintiff,**

v.

**SECRETARY OF the NAVY, Defendant.**

**Civ. A. No. 87–2209.**

United States District Court, District of Columbia.

Nov. 30, 1988.

---

Nathaniel H. Speights, Washington, D.C., for plaintiff.

Susan A. Nellor, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

GESELL, District Judge.

This is a Title VII (42 U.S.C. § 2000e et seq.) race discrimination case arising in the context of a non-selection for promotion in government employment. The case came before the Court for a bench trial after the EEO concluded plaintiff had a prima facie case and settlement efforts broke down because plaintiff desired legal fees and the Navy was unwilling to admit liability as part of an agreed disposition. Proposed findings of fact and conclusions of law have been submitted by the parties after a full trial to the Court on the merits.

The Court has jurisdiction. 42 U.S.C. § 2000e–16(c). All administrative procedures have been followed and plaintiff has sued within the time allowed by the statute.

The claim before the Court is that the selecting official, the General Foreman in the Maintenance Branch of the Transportation Division of the Navy, a black, discriminated against the black plaintiff when he selected a white for promotion to the non-supervisory position of Automotive Equipment Repair Inspector (WC–11). The white applicant and the black plaintiff applicant were co-workers and outstanding mechanics in the Light Duty Section of the Branch.

The selecting official and second line supervisor over the Light and Heavy Duty Sections, Mr. Waters, reported to a white, who viewed his performance as exceptionally competent. Under Waters, the Light Duty Section was, in turn, supervised by a white. Wallace, the white selected for the inspector's job, was the only white mechanic in the Light Duty working unit of seven; all other employees were black. Because the plaintiff was a member of a protected class who applied for and was qualified for a job for which a member of a non-protected class was selected, he made out a prima facie case of race discrimination. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, n. 6, 101 S.Ct. 1089, 1091–94, n. 6, 67 L.Ed.2d 207 (1981), *paraphrasing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

Eccleston and Wallace were exceptionally well and equally qualified.[1] The selecting official was faced with a difficult choice. Shortly after he made his decision, he could not articulate his reasons other than to say he acted on his "gut feeling." (Tr. at 37–38, 97, 151–152). He later attempted, in various forms, to elaborate on his rationale, usually by emphasizing his reliance on the SF 171's, (*See, e.g.,* Tr. at 119), but these statements must be viewed as ex post facto justifications. Under the circumstances presented, the governing rules allowed him to use his best judgment in selecting the individual who would best serve his needs. The defense contends that this "gut feeling" was based on the applications he reviewed and is a proper basis for making a management decision to promote a supervisee. However, under Title VII law, the defendant did not meet his burden of articulating a legitimate, nondiscriminatory reason for the selection. Waters' explanation was neither clear nor reasonably specific, as the law requires. *Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096. While this deficiency gives rise to an inference of discrimination, Eccleston still had the ultimate burden of proving by a preponderance of the evidence that his employer discriminated against him. *Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1093–94.

Eccleston and Waters had many direct contacts during their work and generally got along, but there were tensions from time to time between them. Both were

---

1. For example, both candidates received Best Qualified ratings (Def's Ex. 22; Tr. at 246, 339); both applicants had comparable training provided by the Maintenance Branch, and both received job-related training in high school. (Def's Ex. 11 and 12). Mr. Waters requested the views of the candidates' immediate floor supervisor and his own supervisor in making his decision, and both believed the candidates' qualifications were equal. Tr. at 339, 439.

highly competent, proud of their performance as blacks who had made an extra effort to succeed, and were ambitious to move further. Born in Panama, Eccleston had a strong United States military record. He had taken outside courses in auto mechanics and had followed a career remarkably similar to that of Waters, who came from an established Washington, D.C. black family. However, Waters and his wife had found themselves unable to complete their degrees, while Eccleston had completed his associate's degree and was working towards another degree from the same institution which Waters attended. The selector had commented various times on their similarities, mentioning for instance, that he, too, had studied in his car during breaks when he was in school.

There is no question that a black may consciously or unconsciously discriminate against another black and be liable under Title VII.[2] In this instance, the factual issue of whether he did discriminate is close. Plaintiff contends that Waters intentionally tried to keep another black from promotion for fear that, in the circumstances of this case, the selecting official would find himself outclassed by another black. The defense contends he made the selection properly, and that plaintiff has not met his burden of persuasion. (Defendant's Conclusions of Law, para. 9, 10). Neither of these contentions is supported by a preponderance of the evidence.

There is no solid, corroborated proof of overt race discrimination. Eccleston is somewhat overly sensitive in this area. Perhaps he simply failed adequately to articulate facts that would justify his reactions to slight incidents he considered offensive racial behavior. Eccleston claims he felt excluded or belittled on numerous occasions. For example, he knew how to get a broken key out of an ignition, though he did not tell Waters he knew, and he heard Waters say on the phone that "We don't know" [how to get the key out], but "We're going to research it." Eccleston felt belittled by this. (Tr. at 271–72). Once Waters was standing with other mechanics, showing them a birthday card that he was going to give his grandfather. Eccleston came on the scene, but was told it didn't concern him. Once again he claims this shows racial bias, although Waters was showing the card to other black co-workers.

More serious, yet still not persuasive, is an incident which occurred one day after work, when Eccleston, a neat, well-groomed, attractively youthful individual, put on good clothes in preparation for his evening classes. Waters allegedly said, "You look like a college boy." However, others testified that he did not use the potentially offensive word "boy" at all, (Tr. at 428–29, 445), and at his EEO factfinding hearing, Eccleston himself did not mention the word "boy." In any event, this was not meant to be a racial slur, and it reflected no racial animus, as Eccleston suggests.

A similar comment, though it was flatly denied by Waters and was not witnessed by anyone else, is Waters' alleged comment to Eccleston that he would not "make it" at Northern Virginia Community College; that he and his wife had tried, but that it was too much. (Tr. at 274–75). This incident was presented to exemplify Eccleston's thesis that Waters was the highest-ranking black official in that area of the Navy Yard, and that he zealously guarded this position from the "threat" of other successful blacks. This incident, even if it occurred, does not suffice to meet the burden of persuasion.

In his effort to prove intentional discrimination, Eccleston also called several co-

---

**2.** *See, e.g., Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), rejecting District Court's reliance on "governing majority" theory, which presumed that Spanish-majority would not discriminate in jury selection against others with Spanish surnames. "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings will not discriminate against other members of their group." *Id.,* at 499. Justice Marshall, in concurrence, elaborates on the phenomenon of minority group members, particularly those who have achieved some measure of success, who respond to discrimination and prejudice by adopting the majority's negative attitudes towards other minority members. *Id.,* at 503, 504, 97 S.Ct. at 1284–85.

workers to testify regarding the manager's treatment of other blacks. Most of these examples related to working conditions, not race. Waters is an example of a rising group of managers in the federal service who insist that the sloppy, permissive atmosphere of some agencies in the past must be replaced by scrupulous monitors to assure full compliance with rules previously ignored too often. Waters went by the book. He demanded that workers report on time, remain on the job during working hours, not steal government material, not take unauthorized vacations or feign family emergencies, and record the time they spend on each particular task for the purpose of comparing times spent on particular tasks to private industry standards. The shop was under-financed, under-staffed and under-supplied, but faced Waters' exacting demands as volume mounted. The black mechanics were, by and large, highly experienced and competent but placed under unaccustomed pressures after a long, more relaxed period. They understandably resented the new conditions. They blamed the boss, accepted unfounded rumors regarding discipline of co-workers, and labeled their plight race discrimination. The Court is unpersuaded that the proof demonstrates that the selecting official discriminated in his day-to-day relations with the Light Duty Section staff, especially in light of testimonial proof the Court accepts that the accelerated pace of work existed and was equally applied to whites.

 In addition to the inference of discrimination caused by defendant's failure to articulate a reason for the non-promotion, another consideration more convincingly tips the scale to Eccleston's favor. Wallace was not better qualified than plaintiff for the promotion. Here was a classic opportunity to apply affirmative action. Waters' superior brought this to his attention. Paragraph M of the Merit Staffing Procedures Manual provides that:

[T]he selecting official should choose the person(s) who will best fulfill management's needs in terms of productivity and the total objectives of the organization including affirmative action and equal opportunity.

(Plaintiff's Ex. I) Paragraph P provides that: "When minorities and women are among the best qualified candidates, each manager and supervisor has the obligation to insure that they are given full consideration." The union agreement also provides notice that affirmative action is a goal of management. Article Sixteen of the Negotiated Agreement between the Naval District and the Washington Area Metal Trades Council provides in Section 2 that:

The Committee [EEO] should concern itself primarily with providing advice and assistance to the Head of the Activity in the implementation of the Activity's affirmative action plan. The plan should ultimately enhance employment and advancement opportunities for all employees, with particular emphasis placed on the minority group employees.

(Def.'s Trial Ex. #15). The personnel staffing specialist testified that the selecting official was required to make a selection in accord with the affirmative action plans for his activity. (Tr. at 344). Although the selecting official had attended a class on the Navy's affirmative action plan, and although there were no black or Hispanic supervisors in the shop, in either the Light or Heavy Duty sections at the time of the selection (Tr. at 43–44), Waters stated at trial that he "had not been given [the] information" that the Navy had an interest in promoting highly qualified blacks. (Tr. at 39). This is not credible. During the selection process, Commander Gene Kohler telephoned Waters to bring the affirmative action policy to his attention, but Waters apparently brushed him off. In response to Kohler's inquiry of whether or not Waters was aware that Jose Antonio Eccleston was Hispanic, Waters cavalierly replied that "When I left, he was black." (Tr. at 23, 39, 268). The fact is, Eccleston is both black and Hispanic, but Waters did not take the affirmative action inquiry seriously. Though Waters professed to be a friend of the blacks at the shop, (Tr. at 79), when the chips were down and he had the chance to promote a highly qualified black under circumstances that in no way would have given rise to charges of reverse-discrimination, he hired the white candidate. Title VII does not obligate an employer to

accord a preference to equally qualified minority applicants. *Burdine*, 450 U.S. at 248, 101 S.Ct. at 1091. However, Waters' failure to do so under these circumstances is *evidence* of intentional discrimination that helps to illuminate his inadequate explanation of his "gut feeling." Mr. Waters may not have consciously wanted to hold down the blacks he supervised, but his execution of his duties shows that his gut feelings towards Eccleston, as a black, were tainted with a knowing discriminatory intent.

Like many Title VII cases, this litigation has been unfocused as well as unnecessary. The Navy recognized Eccleston's talents and he now has a far better job than the one in controversy, and he is obviously on his way to further advancement. His back pay claims are minimal, and he agreed to accept a nominal $2,500. The case was tried for an award of attorney fees which Eccleston properly felt he should not have to pay out of his own pocket.

Plaintiff shall receive $2,500 for back pay and a finding and judgment that his non-selection was discriminatory for the sole reason stated in this Memorandum, which constitutes the Court's findings of fact and conclusions of law. Fortunately, the case involves no thorny issue of placing Eccleston "where he would have been," with any attendant ramifications for Wallace, the perfectly worthy white selectee. Plaintiff is entitled to his reasonable attorney fees.

Plaintiff shall file a claim for his reasonable attorney fees within ten days from this determination, and defendant shall respond within ten days thereafter. Rule 215 of the Rules of this Court shall not apply. The Court will fix the amount of the fees on the papers filed if plaintiff's claim is not accepted. If there was a formal fee agreement when counsel was retained, it shall be filed with the claim.

The Clerk of Court shall enter judgment for plaintiff in accordance with this Memorandum.