Oscar Alphonso GREENE, Jr., Plaintiff,

v.

The GEORGIA PARDONS AND PAROLE BOARD, Wayne Snow, Jr., Chairman; James T. Morris, Bettye O. Hutchings; David C. Evans; Timothy E. Jones, Defendants.

Civ. No. 1:90–cv–1129–JEC.

United States District Court, N.D. Georgia, Atlanta Division.

Oct. 26, 1992.

**750**

## ORDER

CARNES, District Judge.

This case is presently before the Court on the Plaintiff's Motion to File Excess Pages [44-1],[1] the Defendants' Motion for Summary Judgment [45-1], and the Plaintiff's Motion for Partial Summary Judgment [46-1]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that Defendants' Motion for Summary Judgment should be granted in part.

## BACKGROUND

Plaintiff, Oscar Alphonso Greene, Jr. ("Greene"), is an inmate in the custody and control of the Georgia Department of Corrections. Greene has brought this action pursuant to 42 U.S.C. § 1983, naming as Defendants the Georgia Pardons and Parole Board ("the Board") and five individual members of the Board.

Based on the parties' statements of undisputed material facts and responses thereto, viewing all evidence and factual inferences in a light most favorable to the non-moving party, the following facts emerge as undisputed:

1. Plaintiff was convicted of voluntary manslaughter on or about September 1985. Plaintiff received a twenty year sentence and was to serve ten years, with the balance to be probated.

2. Plaintiff has at least three prior convictions.[2]

3. Plaintiff had been previously convicted on or about March 1985 for aggravated battery for shooting a man.[3]

4. Using the parole guidelines system, Plaintiff's recommended time to serve was

W. Thomas Haynes, The Coca–Cola Co., Atlanta, GA, for plaintiff.

Michael J. Bowers, Daryl A. Robinson, Terry L. Long, Office of State Atty. Gen., Atlanta, GA, for defendants.

1. This motion was necessary because the previous Judge to whom the case was assigned, the Honorable J. Owen Forrester, had a page limitation on briefs. Because this Court has no such limit, the motion is unnecessary and the Court denies it as moot.

2. Defendants assert that Plaintiff's criminal history includes at least six prior convictions, while Plaintiff claims that only three of these may be properly counted for parole purposes.

3. Plaintiff does not appear to dispute the fact that he was convicted of aggravated battery, but does assert that he did not commit the offense and that it should not be counted as a prior conviction under the parole guidelines. (Pl.'s Resp. to Def.'s Stmnt. of Mat. Facts ¶ 5).

48 months.[4]

5. The Parole Board members who considered Plaintiff's case departed from the guideline recommendation, initially recommending that he serve 120 months. Plaintiff's tentative parole release date was subsequently adjusted to 100 months to serve.

6. The reasons given by the Board for departing upward from the guideline recommendation were that: (1) the number of offenses exceeded those accounted for in the crime severity level, (2) the success factors did not fully reflect Plaintiff's criminal history, and (3) the success factors did not fully reflect Plaintiff's history of assaultive behavior.

7. Defendants David C. Evans and Timothy E. Jones were not on the Parole Board at the time Plaintiff's tentative parole month was set.

## DISCUSSION

A. *The Standard for Summary Judgment*

■ Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In such a situation,

there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552.

■ The movant bears the initial responsibility of asserting the basis for his motion. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; *Apcoa, Inc. v. Fidelity National Bank*, 906 F.2d 610, 611 (11th Cir.1990). However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleading" and present competent evidence[5] designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

**4.** It is unclear to the Court whether Plaintiff disputes this computation and, if so, what he thinks the correct figure should have been under the guidelines. In his response to Defendants' Statement of Material Facts, Plaintiff does not indicate that he believes that the 48 month calculation stated by Defendants is incorrect. (Pl.'s Resp. to Def.'s Stmnt. of Mat. Facts ¶ 6). However, in his Amended Complaint Plaintiff asserts that he should have received a guideline score of 36 months, (Am.Compl. ¶ 10a) while in his own Statement of Material Facts accompanying his Motion for Partial Summary Judgment, Plaintiff indicates that the correct guideline computation should have been 25 months, (Pl.'s Stmnt. of Mat. Facts ¶ 2).

**5.** The non-moving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *See Ross v. Bank South*, 837 F.2d 980, 999 (11th Cir. 1988). However, the mere verification by affidavit of one's own conclusory allegations is not sufficient to oppose a motion for summary judgment. *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir.1984). Likewise, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assoc. v. U.S. Industries*, 736 F.2d 656, 657 (11th Cir. 1984).

**752**

■ A fact is material when it is identified by the controlling substantive law as an essential element of the non-moving party's case. *Id.* at 248, 106 S.Ct. at 2510. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. at 2511. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"[6] *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511. Thus, to survive a motion for summary judgment, the non-moving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

### B. *Plaintiff's Claims*

Plaintiff makes three distinct claims. First, he alleges that he was denied procedural due process in violation of the Fourteenth Amendment because the Board decided to deviate from the guideline release date without adequate procedural safeguards, such as giving Plaintiff the right to contest the departure. (Am.Compl. ¶ 10e). Second, Plaintiff asserts that the Board's use of false information in his parole file when setting his parole release date constituted an abuse of discretion in violation of due process. (*Id.* ¶¶ 10, 11). Finally, Plaintiff alleges that Defendants violated his right to equal protection because the guideline departure was based on the fact that he is a black male. (*Id.* ¶ 12).

### 1. *Procedural due process*

■ An individual's right to procedural due process is violated when the government interferes with his life, liberty, or property without adequate procedural safeguards. *Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). The threshold question in this case is whether or not the Georgia parole system creates a liberty interest—if it does not, summary judgment for Defendants on this issue is appropriate as the Court must rule as a matter of law that Plaintiff's right to procedural due process was not violated.

■ It is clear that there is no constitutional right to parole, and states are not required by the United States Constitution to establish a parole system. *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979). Moreover, a liberty interest is not automatically created by a state's decision to establish a parole system. *See, e.g., Monroe v. Thigpen,* 932 F.2d 1437 (11th Cir.1991) (Alabama parole system does not create liberty interest); *Slocum v. Georgia State Bd. of Pardons & Paroles,* 678 F.2d 940 (11th Cir.), *cert. denied,* 459 U.S. 1043, 103 S.Ct. 462, 74 L.Ed.2d 612 (1982) (previous Georgia parole system did not create liberty interest). However, when the state parole scheme creates a legitimate expectation of parole, a liberty interest subject to the provisions of the due process clause is created. *Greenholtz,* 442 U.S. at 12, 99 S.Ct. at 2106. The Supreme Court has held that a legitimate expectation of parole is created by a statutory scheme that uses mandatory language to provide either that parole must be granted if certain determinations are made, *Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987), or, conversely, that parole must be granted unless certain determinations are made. *Greenholtz,* 442 U.S. at 11, 99 S.Ct. at 2105. In determining whether a liberty interest arises, the Elev-

---

**6.** This standard mirrors the standard for a judgment as a matter of law (previously called a directed verdict) at trial. The question under each is the same: "whether the evidence presents a sufficient disagreement to require sub-

mission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 250–52, 106 S.Ct. at 2511–12.

enth Circuit Court of Appeals has observed that there is a "critical distinction" between a scheme that *requires* release if (or unless) certain findings based on specific criteria are made and a scheme that merely obligates the board to *consider* such criteria in exercising its discretion. *Slocum,* 678 F.2d at 941.

The Eleventh Circuit Court of Appeals has held that the previous Georgia parole system created no legitimate expectation of release and, therefore, created no liberty interest in parole. *Slocum,* 678 F.2d at 940. Since *Slocum,* however, the Georgia legislature has made significant changes to the parole scheme. Subsequent to these changes, the Eleventh Circuit has again held that the Georgia system does not confer a liberty interest in parole. *Gwin v. Snow,* 870 F.2d 616, 618, 627 (11th Cir. 1989) (affirming district court's dismissal of plaintiff's "meritless" claim that Georgia statute creates a liberty interest in parole); *Fuller v. Georgia State Board of Pardons and Paroles,* 851 F.2d 1307, 1309 (11th Cir.1988).

A recent panel of the Eleventh Circuit Court of Appeals, however, has apparently held that the issue of whether or not the revised Georgia parole system creates a liberty interest is still open. In *Sultenfuss v. Snow,* 894 F.2d 1277 (11th Cir.1990), the court determined that a claim alleging a violation of due process as to the misapplication of the parole guideline system should not be dismissed as frivolous pursuant to 28 U.S.C. § 1915(d). The *Sultenfuss* court did not conclude that the amended Georgia statute created a liberty interest, but concluded only that the changes in the statute are sufficiently significant to raise an arguable question of law. *Id.* at 1279.[7]

Defendants assert that current Georgia law creates no liberty interest in parole. Plaintiffs, on the other hand, claim that the Georgia legislature's amendment to the parole system created such a liberty interest. Thus, the Court must examine the current Georgia parole law to determine whether a liberty interest has been created.

The sole power to grant paroles is constitutionally conferred on the Board. GA. CONST. art. IV, § 2, ¶ 2(a). The constitution places restrictions on the Board's authority to pardon or parole certain classifications of convicted inmates (*e.g.,* those with commuted death sentences, those convicted of armed robbery). However, outside of these limitations, the Board's decision to consider or grant parole is purely discretionary. *Justice v. Board of Pardons and Paroles,* 234 Ga. 749, 751–52, 218 S.E.2d 45 (1975). Subsequent to the passage of the 1983 Georgia Constitution, the Georgia Supreme Court has held that the legislature may not place limitations on the substantive powers of the Board to exercise discretion in consideration of an inmate for parole. *Charron v. State Board of Pardons and Paroles,* 253 Ga. 274, 277, 319 S.E.2d 453 (1984).

A careful review of the relevant amended Georgia parole statutory provisions indicates that there are no mandatory substantive pre-conditions to granting or denying parole. The Georgia parole statute provides that "[t]he board shall adopt, implement, and maintain a parole guidelines system for determining parole action." GA. CODE ANN. § 42-9-40(a). This section does no more than require the Board to implement a guideline system for handling parole actions. The section goes on to require that, once the guideline system is established, it "shall be used in determining parole actions on all inmates, except those serving life sentences ..." *Id.* Plaintiff argues that this second sentence establishes an expectation of parole and, thus, a liberty interest in parole.

The Court finds, however, that, if anything, the statute read as a whole establishes a presumption against parole. Section 42-9-42 of the Code provides that:

No inmate shall be placed on parole until and unless the board shall find that there is reasonable probability that, if he is so released, he will live and conduct himself as a respectable and law-abiding person and that his release will be compatible

---

**7.** The *Sultenfuss* case was subsequently remanded, decided on the merits, and is now pending

again before the Eleventh Circuit Court of Appeals.

with his own welfare and the welfare of society. Furthermore, no person shall be released on pardon or placed on parole unless and until the board is satisfied that he will be suitably employed in self-sustaining employment or that he will not become a public charge.

GA.CODE ANN. § 42–9–42(c). Moreover, the board's regulations provide that:

The Parole Decision Guidelines System is an aid to the Board in making more consistent, soundly based and explainable parole decisions and does not create a liberty interest. The Board specifically reserves the right to exercise its discretion under Georgia Law to disagree with the recommendation resulting from application of the Parole Decision Guidelines and may make an independent decision to deny parole or establish a Tentative Parole Month at any time prior to sentence expiration.

Ga.Rules, Ch. 475–3–.05(5).

Plaintiff asserts that the use of the word "shall" in the Georgia parole statute necessarily limits the discretion of the Board and obligates the Board to follow the guidelines in making parole decisions. The Court concludes, however, that the repeated use of the mandatory term "shall," when read in context, does not limit the Board's discretion in such a way as to require the Board to base its decision on any specific, defined criteria. Thus, it appears to the Court that the current Georgia parole system does not require the Board to grant parole based upon the presence or absence of specified findings and, as a result, does not give rise to a liberty interest. *See Gravitt v. Snow,* No. 90–cv–1023–CAM, slip op. at 15 (N.D.Ga. Nov. 27, 1990) (holding that the current Georgia parole system does not create a liberty interest); *Sultenfuss v. Snow,* No. 88–cv–1563–GET, slip op. at 4–5, 1990 WL 457879 (N.D.Ga. Nov. 30, 1990) (same). Because Plaintiff could have no liberty interest in parole, his right to procedural due process could not have been violated and summary judgment is appropriate on this claim.

### 2. *Reliance on erroneous information*

▮ Even under a parole scheme that does not give rise to a liberty interest, a plaintiff's right to due process is violated if the parole board engages in "flagrant or unauthorized action." *Monroe v. Thigpen,* 932 F.2d 1437, 1442 (11th Cir.1991). The Eleventh Circuit Court of Appeals has held that the knowing use of false information in a parole determination violates due process, as the parole board does not have the discretion to rely on false information in determining whether to grant parole. *Id.* In defining the contours of this limited due process right, the *Monroe* court observed that a plaintiff does not state a due process claim merely by making a conclusory allegation that erroneous information must have been used in the parole determination. *Id.* Rather, in the absence of an admission by the parole board that it relied on false information, the plaintiff must present evidence that his file contains false information. *Id.*

Greene has launched a number of attacks on the information that Defendants used in calculating his guideline score and deciding to deviate upward. Given the subjective nature of the parole decision and the difficulty of determining exactly what Defendants considered in deciding to depart from the guidelines, the Court finds that genuine questions of material fact exist as to this claim. Thus, summary judgment is not appropriate and Defendants' motion is denied.

### 3. *Equal protection*

▮ Plaintiff alleges that Defendants have violated his right to equal protection by discriminating against him in their parole decisions because of his race (black) and gender (male). (Am.Compl. ¶ 12). The Supreme Court's equal protection precedent establishes that, in order to prevail on an equal protection claim, a plaintiff must show that the defendant(s) acted with discriminatory purpose. *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987); *Washington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). Merely showing that there is a discriminatory effect to a particular action or policy is not sufficient to establish an equal protec-

tion violation. *Washington*, 426 U.S. at 242, 96 S.Ct. at 2049.

However, a showing of disproportionate impact can clearly be relevant in an equal protection case. *Id.* As the Eleventh Circuit Court of Appeals has observed, "an unexplained statistical showing of disparate racial treatment by a single entity over a period of time could raise the inference of an equal protection violation." *Fuller v. Georgia State Bd. of Pardons and Paroles*, 851 F.2d 1307, 1310 (11th Cir.1988). In order to raise an inference of discriminatory purpose, however, the plaintiff must provide "exceptionally clear proof" of discrimination. *Id.*

Plaintiff attempts to raise an inference of discrimination in two different ways. First, he compares his case to six other "similarly situated" white or female individuals who he alleges received more favorable parole treatment than he received. Second, Plaintiff attempts to use data provided by the Board to present a statistical showing that black males are treated more harshly than others.

#### a. similarly situated individuals

The Court finds Plaintiff's argument that the Board treated similarly situated individuals more favorably than him to be unpersuasive. Plaintiff considers the six named individuals to be similarly situated only because they, like Plaintiff, were convicted of both voluntary manslaughter and aggravated battery or assault. (Mem. in Opp'n to Def.'s Mot. for Summ. J. at 14). However, as the Eleventh Circuit has observed, "[t]he decision to grant or deny parole is based on many factors such as criminal history, nature of the offense, disciplinary record, employment and educational history, etc." *Fuller*, 851 F.2d at 1310. Plaintiff, like the plaintiff in *Fuller*, has not "show[n] himself to be similarly situated,

considering such factors, with any inmates who were granted parole," *id.*, and, as a result, the Court concludes that he has not provided the type of "exceptionally clear proof" necessary to raise an inference of discrimination.

#### b. statistical showing

Although it is apparent that a statistical showing of disparate treatment may be sufficient to raise an inference of purposeful discrimination, *Fuller*, 851 F.2d at 1310, it is not entirely clear what level of statistical certainty is sufficient to raise an inference of purposeful discrimination. In a different context, however, the Supreme Court has observed that a difference of two or three standard deviations between the value that would be expected randomly and the value that is actually observed is sufficient to arouse suspicion.[8] *Castaneda v. Partida*, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977) (discrimination in grand jury selection). While a two or three standard deviation variance is probably sufficient to establish a prima facie case of discrimination under Title VII, *Hazelwood School Dist. v. United States*, 433 U.S. 299, 308 n. 14, 97 S.Ct. 2736, 2742 n. 14, 53 L.Ed.2d 768 (1977), it is likely that a higher degree of certainty is necessary to raise an inference of the purposeful discrimination required to establish an equal protection violation. *Gay v. Waiters' and Dairy Lunchmen's Union*, 489 F.Supp. 282, 311 (N.D.Cal.1980), *aff'd*, 694 F.2d 531 (9th Cir.1982) ("The Supreme Court, while noting that disparities 'greater than two or three standard deviations' would be suspect to a social scientist, has never accepted that level as sufficient to raise an inference of intent.").

It is apparent to the Court that, even using the arguably low two or three standard deviation test and the statistics as

---

**8.** The "standard deviation" of the distribution is the typical deviation from the mean, showing the degree of variance within the distribution. As a general rule, whenever a sample is expected to be normally distributed, one can expect to find approximately 68% of the observations within one standard deviation of the mean, 95% of the observations within two standard devia-

tions of the mean, and more than 99% of the observations within three standard deviations of the mean. David W. Barnes, Fundamentals of Quantitative Evidence 140 (1983). A common statistical term is the "T value," which shows the number of standard deviations a given value is away from the mean.

computed by Plaintiff's expert, Plaintiff's statistical showing is not sufficient to provide the "exceptionally clear proof" of discrimination that is required to raise an inference of purposeful discrimination. Plaintiff's expert analyzed the guideline sentences and the actual sentences imposed by the Board for a number of different categories of offenders, comparing the results for white/black and male/female offenders. (Mullet Aff. Exs. B, C, D, and E). Plaintiff's expert also compared by race and gender the degree of deviation from the guidelines (*i.e.,* the difference between the guideline sentence and the actual sentence imposed) in an attempt to establish that the Board's discrimination has resulted in blacks and males receiving longer sentences relative to their guideline sentences than whites and females. During discovery Plaintiff requested and received from Defendants information on several specific groups of offenders that Plaintiff considered to be similar to him. Two of these categories that are particularly comparable to Plaintiff are (1) those convicted of one or more violent crimes considered for parole in 1985, 1986, or 1990 (the years in which Plaintiff's parole date was considered in some fashion) with guideline scores of at least ten (Plaintiff's score was twelve) ("violent offenders"), and (2) those convicted of multiple violent crimes and considered for parole on or after January 1, 1984 ("multiple violent offenders"). (Mullet Aff. ¶ 7).

### 1) *comparison on racial grounds*

The Court finds one notable flaw with Plaintiff's assertion that his statistical showing has established that the parole board discriminates against black inmates in its parole decisions. For the two categories of offenders most comparable to Plaintiff (the violent and multiple violent offenders mentioned above), the parole board actually deviates from the guidelines to a *greater* extent for *white* offenders than for black offenders (*i.e.,* the Board imposed longer sentences on white offenders relative to their guideline sentence than on black offenders).[9] Moreover, although the statistics do show that black offenders in these two categories are sentenced to slightly longer total sentences than white offenders, the difference along racial lines is not statistically significant.[10] These statistical disparities undercut any inference of racial discrimination by the Board and convince the Court that Plaintiff has not

---

**9.** For violent offenders, the mean deviation between actual and guideline sentences was 16.6 months for whites and only 14.3 months for blacks. (*Mullet Aff. Ex. D at 1*). For multiple violent offenders, the mean deviation was approximately one month for whites and a negative .16 month for blacks (*i.e.,* on the average the Board imposed an actual sentence on blacks in this category that was *lower* than the guideline sentence). (Mullet Aff. Ex. E at 1).

Plaintiff's expert apparently asserts that the Court should disregard the statistical analysis of these groups (which, it should be remembered, were formulated in response to specific interrogatories by Plaintiff because of the similarity of individuals in these groups to Plaintiff), asserting that the absence of statistically significant results is "related more to the smaller sample sizes in these groups than the presence or absence of racial or gender biases in the decisions themselves." (Mullet Aff. ¶ 10). The Court finds this explanation entirely unconvincing. The number of observations in each group range from 845 to 2178—much more than sufficient to ensure a normal distribution upon which statistical projections can confidently be based. GARY SMITH, STATISTICAL REASONING 244 (3d ed. 1991) (distribution of any set of independent random variables becomes acceptably close to a normal distribution as the number of observations approaches twenty to thirty).

**10.** In order to be statistically significant, it must be shown that it is unlikely that the correlation between the dependent variable (in this case, the actual sentence imposed by the Board) and a given independent variable (in this case, race) would occur purely as a result of chance. Statisticians generally use either 95% or 99% as the cutoff for determining whether a given variable is statistically significant (*i.e.,* there is less than either a 5% or 1% chance that the relationship between dependent and independent variables would occur randomly). The 95% confidence interval is roughly equal to a two standard deviation variance. *See infra* note 8.

In this case, there is significantly less than one standard deviation between the actual sentences for whites and blacks in both categories (the T value for violent offenders is $-.31$ with a 75.5% chance that such a result could be due to random chance (shown by the two-tail probability score of .755), (Mullet Aff. Ex. D at 1), while the T value for multiple violent offenders is $-.54$ with a probability that this result could be due to chance of 58.9%, (Mullet Aff. Ex. E at 1)).

produced a statistical showing sufficient to raise an inference of purposeful racial discrimination.

2) *comparison on gender grounds*

As an initial observation, the Court notes that any discrimination based on gender would be subject only to intermediate scrutiny rather than the strict scrutiny under which race-based distinctions are analyzed. *See Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976). Moreover, it does not appear to the Court that Plaintiff has made a sufficient statistical showing to raise an inference of discrimination based on gender.

In the violent offender category, Plaintiff has established that there is a difference of greater than two standard deviations between the departure from the guidelines for male and female inmates (*i.e.,* the Board tends to deviate upward from the guidelines more for males than for females).[11] However, in the multiple violent offender category (the group most similar to Plaintiff) Plaintiff's statistics establish that the Board again actually deviates upward from the guidelines to a *greater* extent for *female* offenders than for males.[12] Moreover, in four of the six other specific categories of offenders that Plaintiff analyzed the results were not statistically significant at the 95% level.[13] Again, the Court concludes that these results, like those in *Fuller,* are "ambiguous at best," 851 F.2d at 1310, and thus are " 'clearly insufficient to support an inference that any of the decisionmakers ... acted with discriminatory purpose.' " *Id.* (quoting *McCleskey v. Kemp,* 481 U.S. 279, 297, 107 S.Ct. 1756, 1769, 95 L.Ed.2d 262 (1987)). Because Plaintiff has not made a statistical showing sufficient to provide the "exceptionally clear proof" of either racial of gender discrimination that is required to raise an inference of discrimination, summary judgment for Defendants is appropriate on this claim.

## CONCLUSION

For the foregoing reasons, the Court concludes that there is no genuine issue of material fact to be tried as to Plaintiff's procedural due process and equal protection claims and Defendants are entitled to judgment as a matter of law as to these claims. Accordingly, Plaintiff's Motion to File Excess Pages [44–1] is DENIED AS MOOT, Defendants' Motion for Summary Judgment [45–1] is GRANTED IN PART and DENIED IN PART, and Plaintiff's Motion for Partial Summary Judgment [46–1] is DENIED.

SO ORDERED.

[redacted]

11. The mean deviation is 15.6 months for males and 10.4 months for females, resulting in a T value of 2.78. (Mullet Aff.Ex. D at 3).

12. The mean upward deviation for males in this classification is only .12 of a month, while, on the average, the Board deviates upward 5.8 months for females. (Mullet Aff.Ex. E at 3).

13. Plaintiff's statistical data establish that the difference between males and females in the "all upward deviations," (Mullet Aff.Ex. C at 4), and "all violent crimes, pre–1990," (*Id.* Ex. D at 4) categories are statistically significant. However, the difference in the "severity level 6 only," (*Id.* Ex. B at 2), "all upward deviations, level 5 or more," (*Id.* Ex. C at 5), "all upward deviations, level 6," (*Id.* at 6), and "multiple crimes, pre–1990," (*Id.* Ex. E at 4) classifications are not significant at the 95% level.