# STATE OF MICHIGAN

# COURT OF APPEALS

DYAN HAMPTON AYTCH,

       Plaintiff-Appellant,

v

SOUTHFIELD BOARD OF EDUCATION,

       Defendant-Appellee.

UNPUBLISHED
October 16, 2018

No. 336790
Oakland Circuit Court
LC No. 2015-148792-CD

Before: GLEICHER, P.J., and BOONSTRA and TUKEL, JJ.

GLEICHER, J. (*concurring in part and dissenting in part*).

Dyan Hampton Aytch, age 61, applied for two school psychologist positions for which she was eminently qualified. She lost out to two younger, less qualified applicants. Defendant's decision to hire the younger psychologists was based solely on subjective interview scoring. Significant gaps and inconsistencies tainted the scoring, however, invalidating its accuracy and giving rise to an inference of pretext.

Viewing the evidence in the light most favorable to defendant, the majority ignores the scoring discrepancies and dismisses the subjectivity of the hiring process as unimportant. I respectfully dissent from this holding. Aytch's evidence casts significant doubt on whether her interview performance truly merited her low scores. In combination with the other evidence presented, Aytch has raised a fact question that precludes summary disposition.

## I. THE PERSPECTIVE FROM WHICH WE MUST VIEW THE EVIDENCE

The majority has nicely summarized the evidence supporting defendant's position. Its opinion sets forth in detail the reasons highlighted by defendant for choosing candidates younger than Aytch. But the majority opinion avoids a meaningful discussion of the facts relevant to Aytch's argument that defendant's subjective hiring process masked discrimination. Those facts center on the legitimacy of the interview scores. Instead of engaging plaintiff's argument, the majority embraces the post-hoc justifications for choosing less qualified, younger psychologists instead of Aytch. Because we are reviewing a grant of summary disposition in defendant's favor, we are supposed to look at the evidence from plaintiff's perspective rather than rubber-stamping defendant's rationales for it employment decisions.

1

When reviewing a summary dismissal, we must consider the pleadings, admissions, affidavits, and other record documentary evidence "in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). In other words, we must acknowledge and credit Aytch's evidence and the reasonable inferences flowing from that evidence. Our function is not to weigh evidence or to discern truth. When the record leaves open an issue on which reasonable minds could differ, a genuine issue of material fact exists that precludes summary disposition. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). Viewing the evidence in the light most favorable to the nonmoving party means that a court may not make findings of fact or assess the credibility of witnesses when deciding a summary disposition motion. *White v Taylor Distrib Co, Inc*, 482 Mich 136, 142-143; 753 NW2d 591 (2008).

In employment discrimination cases governed by the burden-shifting framework established in *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973), a plaintiff may defeat summary disposition by creating "a question of material fact upon which reasonable minds could differ regarding whether discrimination was a motivating factor in the employer's decision." *Hazle v Ford Motor Co*, 464 Mich 456, 466; 628 NW2d 515 (2001). A review of the record undertaken from the correct perspective demonstrates that Aytch proffered sufficient evidence to survive summary disposition.

## II. THE FACTS, VIEWED IN THE LIGHT MOST FAVORABLE TO AYTCH

Aytch worked as a psychologist in the Southfield Public School system from February 2008 until June 2009, when she was laid off due to a reduction in force. Before joining the Southfield Schools, Aytch had worked as a school psychologist for more than 10 years in other districts.

In 2013, two school psychologist positions became available in Southfield. Aytch was considered an "internal" candidate and was qualified for both. Unlike Aytch, neither of the psychologists hired for the positions had a full license, one had not obtained a doctoral degree, and both had less relevant experience. The decisions to hire psychologists other than Aytch rested solely on interviews conducted by Pamela Bard, Southfield's Director of Special Education, and other Southfield Schools personnel. Except in Aytch's case, three or four people took turns asking the candidates 12 questions that had been drafted by Bard. Seven of the questions focused on technical aspects of school psychology practice, and five advanced personal inquiries (such as "Give a brief overview of your employment history" and "What skillsets [d]o you bring for the general education population"). Bard did not prepare model answers and did not share her expectations regarding the answers with the panelists, some of whom were not psychologists. Rather, the panelists were instructed to record as much as possible of the candidate's answers to the questions or "what they observed [during] the answer," and to assign a numeric score from zero to 8.3. No further scoring guidance was provided. The interview scores alone determined who would be hired.

Aytch's discrimination claim hinges on the interview scoring. She asserts that the accuracy of the scores does not withstand scrutiny for several reasons. First, she argues, the scores do not correlate with the interviewees' recorded answers. Because the scoring was purely

2

subjective, Aytch continues, it provided an opportunity for unlawful discrimination. She contends that an examination of the applicants' questions and answers reveals that Southfield's rationale for hiring others was pretextual: it was not grounded in fact and insufficiently explains the hiring decisions. The interview details combined with her prima facie case, she urges, establish a jury question regarding whether the decision to deny her the two positions was rooted in age bias. The evidence bears out her arguments.

## A. THE FIRST INTERVIEW

Only two people interviewed Aytch for the first position, while either three or four people interviewed the other candidates. Aytch's interview was conducted in Bard's office. Bard was 90 minutes late. Aytch sat at a round table across from the other panelist, Sharon Lewis, the principal of Brace-Lederle School. Bard sat behind Aytch. Bard and Lewis alternated asking the prepared questions. Aytch had to turn fully around to address her answers to Bard. The other applicants were interviewed in a different setting by panels of three or four interviewers; Bard sat on every panel. The successful candidate, Julie Netzky, was 39 years old and not fully licensed. Her interview was conducted by four panelists who issued scores ranging from 83 to 100; Aytch's scores were 60.8 (Bard) and 70 (Lewis).

In response to Aytch's age discrimination complaint with the Michigan Department of Civil Rights (MDCR), Bard asserted that Aytch "did not perform well at her interview." She explained that Aytch "did not present herself in a professional manner, in that she had poor eye contact and posture and . . . acted more like she was sitting at the table with the 'girls', rather than a professional being interviewed." Bard did not inform the MDCR of the incommodious seating arrangement and its likely contribution to Aytch's alleged inability to maintain good eye contact.

Aytch points to several of the interview questions and answers as examples of pretext, arguing that they demonstrate that she was scored lower than Netzky for better answers. For example, question number seven asked, "What are some current changes in IDEA/MARSE that are being debated?" IDEA is the Individuals with Disabilities Act, while MARSE stands for Michigan Administrative Rules for Special Education. Bard recorded Aytch's answer as: "RTI school wide programs, Bridging gaps." RTI stands for "response to intervention." Bard scored this answer as a 5. Bard recorded Netzky's answer to this question as: "Willing to learn more about MARSE," and scored it as a 2. Lewis, on the other hand, recorded nothing at all for Netzky's answer but scored it an 8. She documented Aytch's answer as: "artificial distinction [between] gen[eral] ed[ucation] & sp[ecial] ed[ucation]. Not really sure but would address," and scored it with 5 points.

Question 8 inquired, "What is your role in the IEP [Individualized Education Program] process?" Bard wrote down Aytch's response as: "Coordinating, facilitate communication of comm. members, compliant pieces, timelines," and scored it as a 6. Bard gave Netzky an 8 for her response: "Read files, working [with] students, sch[ool] [meeting] with teacher, soc[ial] dev[elopement] History, [illegibile] Dean, write a report." Bard explained that the answer she sought highlighted the role of the psychologist:

What's missing is the school psychologist is one – is the major – is a major facilitator in an – especially in an initial evaluation and the psychologist plays a big role in determining eligibility.

The psychologist is usually the point person with understanding and analyzing data. The psychologist is the one who has the responsibility to communicate that data to not only parents, but to staff so they can understand the data from the evaluation.

That was all missing. The psychologist is responsible for – they are the contact person to make the whole thing gel in determining eligibility. The social worker has limited understanding of data. The speech pathologist has limited understanding of other areas of eligibility, so when you look at the initial evaluation itself the psychologist is the point person to understand data and analyze it.

That is not the response.

Aytch asserts that her answer did, in fact, include communication and "coordination," both of which Bard referenced as necessary.[1] Netzky's response mentioned neither, fell far short of Bard's preferred answer, and yet yielded a score of 8.

Question 9 asked, "What is your experience with Medicaid billing?" As recorded by Bard, Aytch answered, "Trained for it." Netzky replied, "Each year, more organized, weekly basis." Bard scored Aytch's answer with a 5, and Netzky's with a 7. Bard explained that Aytch deserved only 5 points as her answer should have reflected "more in-depth understanding of Medicaid billing." Lewis scored Aytch's answer with 6 points. She recorded Netzky's as: "Being organized, done on a weekly basis, knowledgeable and comfortable [with] it," and gave it 8 points.

Question 11 inquired when an MDR (Manifestation Determination Review) is required. Lewis recorded Aytch's answer as: "Pattern of behavior accumulated. Behavior disp[layed] 10th day if you haven't held [other meeting]. Look [at] all sources of data. Fundamental behavior plan. Compliant process in place." Lewis scored this answer as a 4. Lewis recorded Netzky's answer as: "Out of school 10 days. Understanding of MDR. PD [professional development] . . [sic] online in NSBE to continue cert[ification] [hours]," and awarded 8 points.

The last question was, "Why should you be selected for this position?" Bard recorded Aytch's answer as follows: "Years of exp[erience], commitment, for children, strong advocate for children." Netzky's recorded answer stated: "Make a difference, more comfortable, 13

---

[1] Lewis's note for Aytch's answer reads: "Coordinating. Instigating, facilitate. Be aware of compliant pieces (timeline, extensions, etc). Mi[chigan] Stan[dards]." Lewis scored this answer as a 4, while Netzky received an 8 for: "Prior to evaluation: observ[e] [teacher] discussion. Familiar [with] the process. Reads file 1st, testing session, discuss [with teacher]. Sometimes a social & developmental history [with teacher]. Explore options or will discuss [with] admin[istration] Friday [with] a report."

[years], people person, a need – hit the ground." Netzky was scored 7 points for her answer, while Aytch received 5.

During their depositions, Bard and Lewis offered additional reasons for choosing Netzky. Bard asserted that Aytch was "not a team player" based on answers in which "she did not bring in people to collaborate[.]" Aytch's answers lacked "depth and content," Bard claimed. Netzky's answers were better in these regards. Additionally, Netzky "was more engaging, she had eye contact, she had more flavors in the interviewing process. She was the expectations of the department . . . ." Lewis expressed that Netzky "was more professional, was more excited about the new opportunities. . . . [S]he seemed to have a personality that seemed welcoming and open and easy to engage." Aytch did not demonstrate a "sense of engagement," Lewis explained, which Lewis defined as "[p]ersonable . . . smiling, physical attributes that you should show like smiling. . . . I expect somebody to be excited about possibly having a position."

After Netzky was hired, Aytch filed an age discrimination complaint with the MDCR.

## B. THE SECOND INTERVIEW

Aytch applied for a second school psychologist position at the Bussey and Levey Schools, focused on children aged three to five. She sat for an interview in August 2013 with Bard, Sandra Screen (a psychologist working with the Southfield Schools on a contractual basis), and Rita Teague, the Levey School principal. Teague was called away after five minutes, and Aytch's interview continued without her. Bard admitted that she was aware of Aytch's age discrimination claim before conducting the second interview.

Dr. Aja Temple, age 35, was hired for the position. Temple had no preschool experience, while Aytch had worked in an early childhood program with Head Start preschoolers. Once again, Aytch received poor scores for her interview: a 69 from Bard and a 76.3 from Screen. Bard scored Temple with 96 points and Screen gave Temple a score of 100, slightly above the mathematically possible maximum.

Review of the scoring sheets reveals scoring discrepancies. Question 4 asked, "What are the mandated eligibility determination areas for a school psychologist?" Bard recorded Aytch's answer as: "CI [cognitively impaired], SLD [specific learning disability], EI [emotionally impaired], ECDD [early childhood developmental delay], ASD [autism spectrum disorder], OHI [other health impairment]" and scored it a 4. According to Bard, Temple answered: "Eligibility – EI, sp[anish]/lang[uage]; LD [learning disability], ASD, EI, CI," and scored it as 8. Question 5 asked, "If your scores are inconsistent with prior evaluative data, what would you do to validate eligibility determination?" Bard reported Temple's answer as: "Open a REED [review of existing evaluation data], determine norm[ative] base, obs[erve], CBA [curriculum based assessment], consultation bring to team," and scored it an 8. Aytch's answer earned only a 4: "Detailed history, update Medical data, infor[m] family; requires getting as much information, if rule out factors, what meas[ures] are, how they compare."

Question 6 inquired, "What skillsets [d]o you bring for the general education population?" Bard recorded Aytch as stating, "Clinical skills – knowledge about family, how they impact family exposure to PD [professional development] – management training, multi

cultures . . . outside of schools, cultural diverse, fierce accountability, multi[?]counselor," and scored her with a 3. Temple's answer according to Bard, was: "[work with] teacher, timer [?], trust; help conversation, make part of time, step out comfort zone." Bard scored Temple with 8 points.

Question 11 asked when an MDR is required and "[w]hat is the psychologist role?" Bard documented Temple's response as: "MDR – recur[ring] POB [pattern of behavior], 10 conse[cutive] days of sus[pension], large incidence help clarify due process, help team work through ass[istant]" and scored it an 8. Aytch answered: "IEP – potential for being disc[iplined] history suspended, notice to parents, a[n] infraction is related to disability, BIP [behavior intervention plan], data in order, LEA [representative from the local education agency] must prove did what supposed" and was scored half as many points, a 4.

Screen's scores reflect similar discrepancies. Screen admitted at her deposition that the scoring was "basically subjective."

## III. THE AGE DISCRIMINATION CLAIM

Aytch's complaint asserted three claims: age discrimination, retaliation, and violation of MCL 380.1248 of the Revised School Code, MCL 380.1 *et seq.* The circuit court granted summary disposition in favor of Southfield on all three. I concur with the majority's conclusion that the circuit court properly dismissed Aytch's claims of retaliation and violation of the Revised School Code. I cannot agree, however, that the lower court had grounds to dismiss Aytch's claim of age discrimination.

## A. THE LEGAL STANDARDS

The CRA forbids employers from discriminating against individuals with respect to employment, compensation, or a term, condition, or privilege of employment, because of age. MCL 37.2202(1)(a). In a case built on circumstantial evidence, such as this one, the plaintiff's evidence is considered under the burden-shifting framework set forth in *McDonnell Douglas*, 411 US 792. *McDonnell Douglas* allocates the burden of production and dictates the order of the presentation of proof. *St Mary's Honor Ctr v Hicks*, 509 US 502, 506; 113 S Ct 2742; 125 L Ed 2d 407 (1993). Although the ultimate question at a trial is whether Aytch proved age discrimination, at the summary disposition stage her burden is to bring forward evidence casting doubt on Southfield's reason for hiring others and raising a credible inference that defendant harbored discriminatory animus:

> The inquiry at this final stage of the *McDonnell Douglas* framework is exactly the same as the ultimate factual inquiry made by the jury: whether consideration of a protected characteristic was a motivating factor, namely, whether it made a difference in the contested employment decision. The only difference is that, for purposes of a motion for summary disposition or directed verdict, a plaintiff need only create a question of material fact upon which reasonable minds could differ regarding whether discrimination was a motivating factor in the employer's decision. [*Hazle*, 464 Mich at 466.]

6

The federal Court of Appeals for the Sixth Circuit has highlighted that " 'to survive summary judgment, a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale.' " *Griffin v Finkbeiner*, 689 F3d 584, 593 (CA 6, 2012), quoting *Blair v Henry Filters, Inc*, 505 F3d 517, 532 (CA 6, 2007). A plaintiff is not required to produce evidence that discrimination was the real reason for the adverse employment action to defeat summary disposition. *Griffin*, 689 F3d at 593-594. Evidence of pretext enhanced by the evidence creating a plaintiff's prima facie case suffices to create a question of fact.

The first *McDonnell Douglas* step is the establishment of a prima facie case.

A plaintiff presents a rebuttable prima facie case of unlawful age discrimination by showing that she (1) belongs to a protected class, (2) suffered an adverse employment action, (3) was qualified for the position, and (4) was treated less favorably than a similarly situated, younger employee. *Lytle v Malady*, 458 Mich 153, 177; 579 NW2d 906 (1998). This burden "is not onerous." *Texas Dep't of Community Affairs v Burdine*, 450 US 248, 253; 101 S Ct 1089; 67 L Ed 2d 207 (1981). Establishment of the prima facie case creates an inference of unlawful discrimination and compels the employer to come forward with evidence that legitimate, nondiscriminatory reasons propelled its employment decision.

If the employer produces such evidence, the presumption of discrimination created by the prima facie case falls away. But this does "not imply that the trier of fact no longer may consider evidence previously introduced by the plaintiff to establish a prima facie case." *Id*. at 256 n 10. The prima facie case remains relevant:

> A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation. [*Id*.]

With the employer's proffer of a legitimate, nondiscriminatory reason for its employment decision, the burden of production shifts back to the plaintiff. The employee may avoid summary disposition by discrediting the employer's rationale. "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id*. at 256. As the Supreme Court put it in *McDonnell Douglas*, 411 US at 804, the employee "must . . . be afforded a fair opportunity to show that [the employer's] stated reason for [its adverse employment action] was in fact pretext."

A pretextual explanation may be established "by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 US at 256. Demonstrating pretext involves showing that the employer's rationale for its decision "either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *White v Baxter*

7

*Healthcare Corp*, 533 F3d 381, 393 (CA 6, 2008). See also *Feick v Monroe Co*, 229 Mich App 335, 343; 582 NW2d 207 (1998).

> A candidate's qualifications for a position are relevant to the pretext analysis.
>
> If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture. [*Aka v Washington Hosp Ctr*, 156 F3d 1284, 1294 (DC Cir, 1998).]

Also relevant is the reasonableness of the employer's explanation for its decision. "The more idiosyncratic or questionable the employer's reason, the easier it will be to expose as a pretext, if indeed it is one." *White*, 533 F3d at 393 (cleaned up).[2]

Purely subjective reasons for an employment decision may also raise red flags, "[p]articularly in cases where a jury could reasonably find that the plaintiff was otherwise significantly better qualified than the successful applicant[.]" *Aka*, 156 F3d at 1298. "[A]n employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination." *Id*. Subjective factors merit special scrutiny when they are invoked to explain passing over a more qualified candidate in a protected class. See *Bodaghi v Dep't of Natural Resources*, 995 P2d 288, 300 (Colo, 2000). "The use of such subjective criteria as 'dedication' and 'enthusiasm' also may offer a convenient pretext for giving force and effect to racial prejudice, and can create a strong inference of discrimination if there is a showing of significant disparity in the representation of a particular group." *Mohammed v Callaway*, 698 F2d 395, 401 (CA 10, 1983) (cleaned up). One federal circuit court of appeals "infer[s]" pretext "when the criteria on which the employers ultimately rely are entirely subjective in nature." *Jones v Barnhart*, 349 F3d 1260, 1267-1268 (CA 10, 2003). Similarly, the United States Court of Appeals for the Second Circuit has "cautioned that an employer may not rely solely on wholly subjective and unarticulated standards as a basis for its promotion decisions." *Mandell v Suffolk Co*, 316 F3d 368, 381 (CA 2, 2003), citing *Byrnie v Town of Cromwell, Bd of Ed*, 243 F3d 93, 104 (CA 2, 2001).

In *St Mary's Honor Ctr*, 509 US 502, the United States Supreme Court revisited the role of the prima facie case in step three of the summary disposition analysis. The Court re-affirmed that "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *Id*. at 511. A factfinder may rely on disbelief to infer intentional discrimination. Under that circumstance, no additional proof of discrimination is required. *Id*.

---

[2] This opinion uses the new parenthetical (cleaned up) to improve readability without altering the substance of the quotation. The parenthetical indicates that nonsubstantive clutter such as brackets, alterations, internal quotation marks, and unimportant citations have been omitted from the quotation. See Metzler, *Cleaning Up Quotations*, 18 J App Pract & Process 143 (2017).

*St Mary's* came to the Supreme Court with a full record after a bench trial. After its release, a split developed in the federal courts of appeal regarding its application in summary judgment proceedings. The Michigan Supreme Court adopted an "intermediate position" in that regard, holding that a plaintiff does not "*always* present a triable issue of fact merely by rebutting the employer's stated reason(s); put differently, that there may be a triable question of falsity does not necessarily mean that there is a triable question of discrimination." *Town v Mich Bell Tel Co*, 455 Mich 688, 698; 568 NW2d 64 (1997) (cleaned up). Nevertheless, the Supreme Court explained, "evidence sufficient to discredit a defendant's proffered nondiscriminatory reasons for its actions, taken together with the plaintiff's prima facie case, may be sufficient to support (but not require) a finding of discrimination." *Id*. (cleaned up).

The United States Supreme Court returned to this issue in *Reeves v Sanderson Plumbing Prods, Inc*, 530 US 133, 143; 120 S Ct 2097; 147 L Ed 2d 105 (2000), and reiterated that the employee's prima facie proofs remain relevant to the third step of the *McDonnell Douglas* equation:

> [A]lthough the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual. [Cleaned up.]

The Supreme Court highlighted that a plaintiff may succeed by building her case on disbelief of the defendant's claims:

> [I]t is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. Specifically, we stated:
>
> > The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.
>
> > Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt. Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. [*Id*. at 147 (cleaned up, emphasis in original).]

9

Like *St Mary's*, *Reeves* arose from a trial. On summary judgment/disposition, the question is whether the prima facie case in combination with evidence calling into question the honesty of an employer's rationale raises a reasonable inference of discrimination. The Supreme Court underscored in *Reeves*, 530 US at 150 (cleaned up), that "the standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same." Thus, in evaluating a discrimination case relying on circumstantial evidence, a court should review all evidence of record and draw all reasonable inferences in favor of the nonmoving party without weighing evidence or making credibility assessments. *Id*.

## B. THE LEGAL STANDARDS, APPLIED

Southfield does not dispute that Aytch established a prima facie case of age discrimination. It offers a single explanation for hiring two younger psychologists: the other candidates had better interview scores. Aytch asserts that Southfield's entirely subjective hiring process masked age discrimination, and that her interview performance was not the true reason for her failure to obtain a position but a pretext for discrimination.

Aytch argues that the interviewers' notes and scores, as well as their testimony, create a fact question regarding whether age discrimination motivated Southfield's decisions to hire two younger psychologists. The interview scores, she urges, were pretextual; review of many of her answers compared with those of Netzky and Temple reveals no meaningful differences that support the widely divergent numbers. Thus, the issue presented is whether the record contains sufficient evidence for a reasonable jury to find that the interview scoring actually functioned as a pretext for discrimination. Another way of asking this question is: has Aytch presented evidence rebutting the truth or the validity of Southfield's rationale—interview performance— for twice selecting younger and less qualified candidates? If so, does other evidence substantiate a colorable claim of discrimination?

Viewed in the light most favorable to Aytch, the evidence meets the threshold required to proceed to trial.

Indisputably, Aytch was better qualified for the two school psychologist positions than Netzky or Temple. Aytch had more relevant experience, was fully licensed, and, unlike Netzky, had obtained a doctoral degree. Southfield's reasons for selecting two significantly younger, less qualified candidates rested solely on wholly subjective interview scores. The interview scoring reflects discrepancies that raise an inference that Aytch's performance was not the actual reason for her failure to be selected for a position.

When compared to the answers recorded for the successful applicants, the answers documented for Aytch raise a question of pretext. For example, question 5 probed the interviewees' knowledge of a technical subject: "current changes in IDEA/MARSE." Bard and Lewis recorded entirely different answers for Aytch. Bard's notes state that Aytch answered: "Respond to intervention, bridging gaps." Lewis claimed that Aytch discussed: "artificial distinction [between] gen[eral] ed[ucation] and sp[ecial] ed[ucation]. Not really sure but would address." Bard and Lewis scored Aytch's answers with a 5, while Lewis gave Netzky an 8 (almost a perfect score) without recording any answer at all. Bard recorded that Netzky promised to learn more about the subject and gave Netzky only a 2. The inconsistency in

Netzky's scoring, combined with the discrepancies in Aytch's recorded answers, suggest that Aytch's answers were not taken seriously.

Similar inconsistencies are evident in the scoring for question 11, which tested the examinees' knowledge of Manifestation Determination Reviews, further exemplifying the apparent randomness of the scoring system. Lewis scored Aytch's lengthy answer ("Pattern of behavior accumulated. Behavior disp[layed]. 10th day if you haven't held [other meeting]. Look [at] all sources of data. Fundamental behavior plan. Compliant process in place") with a 4; Lewis scored Netzky's far more general response ("Out of school 10 days. Understanding of MDR. PD online in NSBE to continue cert[ification] [hours].") as an 8, again an almost perfect score. Again, this scoring inconsistency undercuts the credibility of the scores in general.

The answers and scoring for question 4 ("What are the mandated eligibility determination areas for a school psychologist?") also appear discordant. According to Bard, Aytch answered: "CI, SLD, EI, ECDD, ASD, OHI." This merited a 4. Temple answered: "Eligibility – EI, sp[anish]/lang[uage]; LD, ASD, EI, CI," an almost identical answer, and Bard scored it as 8.

Further, Bard's descriptions of the personality factors on which she relied in choosing applicants other than Aytch are permeated with clichés lacking substance, such as that Netzky "had more flavors in the interviewing process" and met "the expectations of the department." At her deposition, Bard claimed that Aytch had not demonstrated that she understood the role of communication with parents and staff, despite that Aytch had specifically referenced the role of communication when answering question 8 and referred to communication more generally in several other answers.

It is unclear why Aytch was scored far lower than Netzky and Temple for answers that either appear equivalent or better. The scores for some questions appear almost random, bearing little connection to the interviewers' notes. Bard's reasons for rejecting Aytch in favor of the younger candidates do not explain the scoring discrepancies. The majority's reliance on post-litigation explanations contravenes the first principle of summary disposition analysis: we do not uncritically credit the accuracy of one side's testimony. When an employer advances purely subjective reasons for a decision, their validity hinges on credibility—and we must take no position. Nor are we empowered to decide whether Southfield discriminated on the basis of age. Our job is only to determine whether Aytch has marshalled sufficient evidence to submit this question to a jury.

Because the scores determined who would be hired and the scoring inconsistencies and arbitrariness undercut the legitimacy of the interview process, Aytch has raised a credible claim of pretext. When combined with her prima facie case and the fact that she was better qualified than the other two psychologists, I would hold that a jury may reasonably infer intentional age discrimination. At this stage, when viewed in the light most favorable to Aytch, the facts permit but do not compel an inference of discrimination, thereby defeating summary disposition.

11

## C. THE MAJORITY'S LEGAL ERRORS

Although the majority gives lip service to the principle that evidence of pretext may rest on subjectivity, it finds no pretext because "the interviewers were approximately plaintiff's age," "[a]ge was never discussed at the interview," and "none of the interview questions appear designed to reveal information about a candidate's age."

That the interviewers were "approximately plaintiff's age" is irrelevant to any issue in this case. "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." *Castaneda v Partida*, 430 US 482, 499; 97 S Ct 1272; 51 L Ed 2d 498 (1977). The Supreme Court has subsequently emphasized, "If our precedents leave any doubt on the question, we hold today that nothing in Title VII necessarily bars a claim of discrimination because of sex merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex." *Oncale v Sundowner Offshore Servs, Inc*, 523 US 75, 79; 118 S Ct 998; 140 L Ed2d 201 (1998) (cleaned up). The interviewers' age similarity to Aytch simply does not preclude or weaken a claim of age discrimination at the summary disposition stage. See *Wexler v White's Fine Furniture, Inc*, 317 F3d 564, 574 (CA 6, 2003).

The majority's two remaining points evince a misunderstanding of a *circumstantial* evidence case. In the vast majority of discrimination cases, there is no *direct* evidence that reflect animus, such as would be revealed by interview questions or comments specific to age. Contrary to the majority, the *McDonnell Douglas* burden shifting framework permits a plaintiff to pursue a discrimination claim based solely on circumstantial evidence. By focusing on and accepting as truthful the interviewers' explanations for the scoring, the majority has incorrectly reviewed the evidence from Southfield's perspective. By crediting as dispositive comments critical of Aytch's "enthusiasm," her lack of "suitability" and "engagement," and that she failed to meet "the expectations of the department," the majority utterly overlooks that these are purely *subjective* judgments lacking record support, and that their vacuity bolsters Aytch's claim of pretext rather than Southfield's defense.

The majority further confuses its legal analysis by suggesting that Aytch has merely questioned Southfield's "business judgment" rather than demonstrating a factual dispute regarding discriminatory animus. The "business judgment" defense has no role to play here. Aytch did not question whether the decision to hire others was imprudent or unsound from a business perspective. Rather, she asserted that Southfield's proffered justification for hiring two younger psychologists was false or lacked any provable factual basis. See *Debano-Griffin v Lake Co*, 493 Mich 167, 180-181; 828 NW2d 634 (2013).

Viewed in its entirety, Aytch's evidence creates a fact question regarding whether Southfield's reasons for rejecting her were pretextual and based on her age. I would remand for a trial on this count of her complaint.

/s/ Elizabeth L. Gleicher

12